# Illinois Official Reports

## Appellate Court

***Parks v. Brinkman*, 2014 IL App (2d) 130633**

| | |
|---|---|
| Appellate Court Caption | PENNY PARKS, Plaintiff-Appellee, v. DENNIS BRINKMAN and LAKESIDE LEGACY FOUNDATION, Defendants (Crystal Lake Jaycees, Defendant-Appellant). |
| District & No. | Second District<br>Docket No. 2-13-0633 |
| Filed | May 2, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries plaintiff suffered while she was volunteering to help the Jaycees at an Oktoberfest event and another volunteer hugged her and attempted to throw her over his shoulder but fell down and landed on top of her, the trial court erred in entering the jury's finding that the Jaycees were vicariously liable for the conduct of the other volunteer and judgment was entered for the Jaycees, since plaintiff failed to present a *prima facie* case for imposing vicarious liability, especially in the absence of sufficient evidence that the kind of conduct involved in plaintiff's injury was the kind the volunteer was employed to perform and that the volunteer's conduct was motivated by a purpose to serve the Jaycees. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 07-LA-464; the Hon. Thomas A. Meyer, Judge, presiding. |
| Judgment | Reversed. |

Counsel on Appeal
Daniel E. Compton, of Compton Law Group, of Elgin, for appellant.

Mark J. Vogg, Hans A. Mast, and Thomas J. Popovich, all of Law Offices of Thomas J. Popovich, P.C., of McHenry, for appellee.

Panel
JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1 This appeal arises from an incident in which Dennis Brinkman, a volunteer at an event staffed by the defendant, the Crystal Lake Jaycees, hugged and picked up another volunteer, the plaintiff, Penny Parks. Brinkman lost his balance and fell to the ground, injuring Parks. Parks sued, and the case went to a jury trial. The jury found the Jaycees vicariously liable for Brinkman's conduct. The Jaycees appeal, arguing that the verdict was against the manifest weight of the evidence. We reverse, holding that the Jaycees were entitled to judgment notwithstanding the verdict.

¶ 2 I. BACKGROUND

¶ 3 A. Factual Background

¶ 4 The following facts are drawn from the trial testimony and other evidence submitted by the parties and are undisputed except as noted. One of the central issues at trial, as in this appeal, was whether hugging was "within the scope" of Brinkman's employment as a volunteer for the Jaycees. Thus, much of the evidence summarized here concerns the extent to which hugging was either customary or encouraged at Jaycee events. Other evidence that relates only to a specific issue on appeal is summarized elsewhere, when that issue is discussed. Finally, evidence regarding other issues that are not raised in this appeal, such as Parks' injuries and damages, is largely omitted.

¶ 5 On September 28, 2007, the Lakeside Legacy Foundation held an Oktoberfest event at the Dole mansion in Crystal Lake. There was a carnival on the grounds, and the Jaycees provided volunteers for the ticket booth, the beer tent, and security. The event began at 5 p.m. on Friday and continued through the weekend.

¶ 6 The plaintiff was in her late thirties at the time of the accident. She was not a member of the Jaycees, but she was familiar with the group and had participated in Jaycee events before, beginning in 1994. The plaintiff had lived in Minnesota for several years. She also had lived in Illinois at various times, however, and she moved back to Illinois a few months before the

accident. At the time of the accident, she was working in a sub sandwich shop as a management trainee. Her boss, Roger ("Chip") Whitman II, was a member of the Lakeside Legacy Foundation. He asked her if she would volunteer at the Oktoberfest event. He himself attended the Oktoberfest on Friday evening as a volunteer for Lakeside Legacy.

¶ 7     Noni Valicenti, the plaintiff's sister, had been a member of the Jaycees for about 14 years. She was in charge of recruiting and organizing volunteers for the Oktoberfest event. She also asked the plaintiff to come volunteer at the event.

¶ 8     The plaintiff arrived at the event at about 7:15 p.m. She checked in with Valicenti, who was at the ticket booth, and then toured the area around the beer tent, taking pictures of volunteers and guests with her camera. In some of the pictures she took, Jaycees had their arms around each other. The plaintiff saw a number of Jaycees she knew, including Brinkman. Brinkman was working as a Jaycee volunteer in the beer tent, either pouring or serving beer. The plaintiff greeted several of the Jaycees, hugging them as she did so. She and Brinkman did not greet each other at that time, as he was busy.

¶ 9     There was conflicting evidence regarding the extent to which the plaintiff knew Brinkman prior to the accident. At trial, the plaintiff testified that she met Brinkman for the first time only a few weeks before the accident, at a wedding they both attended. After giving this testimony, the plaintiff was impeached with her deposition testimony that she first met Brinkman in 2004 or 2005. The plaintiff also testified at trial that, at the wedding as well as at a Jaycee event they both attended shortly before the Oktoberfest, Brinkman hugged her and she hugged him back. Whitman testified that the plaintiff told him after the accident that she knew Brinkman well.

¶ 10     After the plaintiff took some pictures, she picked up her Jaycee volunteer's T-shirt and went to the bathroom to change into it. As she was returning to the beer tent to start her shift, she encountered Brinkman. Brinkman greeted her and hugged her. According to the plaintiff, her arms were at her sides during the hug because she was not expecting the hug. Brinkman then picked her up in the air so that she was on his shoulder. The two of them fell over, Brinkman landing on top of the plaintiff. The plaintiff testified that this was not the sort of hug that she usually received from Jaycees; she had never been picked up before when hugging a Jaycee.

¶ 11     The plaintiff was dazed and injured, and after she picked herself up off the ground, she went to rest nearby. While she was resting, Whitman (who had heard that she had been injured) came and spoke with her. Whitman initially testified that the plaintiff said she had been hurt when Brinkman picked her up and tried to sling her over his shoulder; the plaintiff did not say that Brinkman embraced her. On cross-examination, however, Whitman stated that the plaintiff might have mentioned a hug; he did not recall. The plaintiff testified that she told Whitman that Brinkman hugged her and picked her up and they fell over.

¶ 12     The plaintiff then went to tell her sister what happened. Valicenti asked a fellow volunteer to take the plaintiff to the hospital. The plaintiff testified that she was in pain throughout the weekend and afterward. She returned to the Oktoberfest twice on Saturday but could not work. The plaintiff sustained injuries to her shoulder, neck, and back.

¶ 13     Various witnesses testified at trial regarding the role of hugging within the Jaycees. The plaintiff testified that she knew many Jaycees, who were like a second family to her. It was common for them to greet one another with hugs, although Jaycees also greeted each other with handshakes. She would hug Jaycees to greet them when she knew them well. The plaintiff testified that she allowed Brinkman to hug her at the Oktoberfest because Jaycees "always embraced." When asked why, in her experience, Jaycees were "commonly greeting and hugging and–welcoming each other," the plaintiff responded that it was done to show that the Jaycees were a friendly and warm group that others would want to be a part of.

¶ 14     Valicenti testified that the mission of the Jaycees was to promote business skills within its members, who were between 21 and 40 years old. (The name "Jaycees" was derived from the description of it as a "Junior Chamber of Commerce.") This mission involved providing "opportunities for individuals to gain leadership skills, social responsibility skills, education skills, so that they can through their fellowship do good within the community." The Jaycees sponsored a variety of community service events. The group also had a social purpose, promoting close relationships among its members by sponsoring purely social events, and this was historically one of the group's purposes. In Valicenti's experience, building bonds between the members was just as important as the community service and skill improvement activities.

¶ 15     At any Jaycee function, people would be greeted "by a hello, a handshake, a hug." This bonding would create a positive and inviting environment. When asked whether the hugs and handshakes were just in "the nature of working together over time and getting to know each other" or whether there was also a "Jaycee purpose" to them, Valicenti responded that it was the nature of the Jaycee organization and also many other organizations to foster this type of bonding and inviting atmosphere. On cross-examination, Valicenti agreed that all similar organizations had a social aspect, because no one would want to join an organization full of unfriendly people. The friendly atmosphere encouraged by the Jaycees was expressed by different people in different ways; some people hugged, some did not. Jaycees who served as recruiters at an event were instructed to be warm and friendly, not to hug people. The Jaycees had no written policy of encouraging hugging.

¶ 16     Ann Brophy, a past president and vice president of the Crystal Lake Jaycees, testified that the Jaycees was founded to develop business and leadership skills among its members. Jaycee-sponsored events included training to improve members' skills at writing and public speaking, leadership skills, and networking. The Jaycees also sponsored community service events and social events for members and prospective members. The Jaycees was an all-male organization until the mid-1980s, when it began accepting women members. The Jaycees had no policy encouraging hugging or physical contact. Greetings, handshakes, and hugs were common among members of the Jaycees. Picking people up was not commonly done by Jaycees; she had never seen this occur between Jaycees.

¶ 17     Brophy herself had many close friends among the Jaycees, and she would hug them when she saw them. However, that was because of the friendship, not because of any Jaycee policy. She would do the same even if she had gotten to know these friends through a different organization. There were other Jaycees whom she did not hug, because she was not as close

with them. She had never hugged or embraced anyone for the purpose of recruiting him or her to join the Jaycees.

¶ 18 Brophy had known Brinkman through the Jaycees for several years; he hugged people at both Jaycee and non-Jaycee events. At the Oktoberfest in September 2007, Brinkman's job as a volunteer was to pour or serve cups of beer; embracing people was not part of his role.

¶ 19                              B. Procedural History

¶ 20 In December 2007, the plaintiff filed a personal injury lawsuit against Brinkman, the Jaycees, and the Lakeside Legacy Foundation. The plaintiff's claim against Brinkman alleged that he negligently caused her personal injuries in that he "attempted to pick [her] up *** without the ability to do so safely"; failed to warn her that he was going to make physical contact with her; and "man-handled [her] in an unreasonable and unauthorized manner." The claim against the Jaycees and the Lakeside Legacy Foundation alleged that Brinkman was acting as their agent at the time of the accident and that they negligently failed to train and supervise him properly.

¶ 21 The plaintiff amended her complaint in November 2009. She added the following allegations about Brinkman's conduct toward her on the day of the accident: that he attempted to pick her up without her consent; that he committed battery by making unauthorized contact with her; that he was intoxicated to the point that he could not appreciate the risks of his conduct toward others; and that he failed to control his actions so as to avoid harm to others. She also added a new count II that asserted a vicarious liability claim against the Jaycees. Finally, she amended count III (formerly count II) to allege that the Jaycees and the Lakeside Legacy Foundation negligently hired, trained, and supervised Brinkman, and failed to warn other volunteers about Brinkman based upon his past conduct. A trial date was set, along with dates for the close of discovery, the filing of motions *in limine*, and a pretrial conference.

¶ 22 In November 2010, the attorney for Brinkman filed a motion *in limine* seeking to bar the introduction of any evidence or argument regarding any prior bad conduct by Brinkman, on the grounds that it would be unfairly prejudicial and irrelevant to the claim against him (Brinkman admitted that he had been drinking beer on the night of the accident). Brinkman also moved to sever the trial of the claim against him from the trial of the negligent supervision claim against the two organizations, because if the claims were tried together, evidence of Brinkman's prior bad acts would be admissible to show the organizations' prior notice of Brinkman's alleged conduct of drinking and inappropriate touching, even though that evidence would be inadmissible as to Brinkman's own liability.

¶ 23 The plaintiff opposed both motions. The Jaycees opposed the motion to sever but supported the motion *in limine*. The Lakeside Legacy Foundation also opposed severance. The trial court granted the motion *in limine*, and as a result, Brinkman withdrew his motion to sever.

¶ 24 On March 16, 2011, the plaintiff voluntarily dismissed Brinkman from her suit. As part of the dismissal, Brinkman agreed to appear and testify at trial for any party that requested him to do so. In April 2011, the trial court granted the Lakeside Legacy Foundation's motion for

summary judgment, finding that there was no evidence that Brinkman was acting as an agent of that organization at the time of the accident. The trial court denied the Jaycees' motion for summary judgment on count III, the negligent supervision claim.

¶ 25    In May 2011, the plaintiff filed a motion to vacate the trial court's November 2010 order barring evidence regarding Brinkman's prior misconduct. The plaintiff argued that, in its recent ruling denying the Jaycees' motion for summary judgment on count III, the trial court had referred to evidence that the Jaycees had notice that Brinkman had misbehaved in the past. The plaintiff sought to vacate the earlier order so that she could present evidence at trial to support count III. The Jaycees opposed the motion, arguing that the evidence about Brinkman's prior misconduct was vague or based on hearsay.

¶ 26    On July 14, 2011, the trial court granted the plaintiff's motion in part, vacating its previous ruling but only as to certain evidence. Specifically, the trial court lifted its blanket ban on evidence regarding Brinkman's history of physical contact with people, the fact that Brinkman had been warned not to touch women, and Brinkman's history of flirting with women and initiating physical contact. The trial court stated that it would rule on the admissibility of such evidence "as it came in" at trial.

¶ 27    About two weeks before trial, the Jaycees (hereafter, the defendant) filed a series of motions *in limine*. The trial court granted the defendant's request to bar evidence of any "prior reprimands or discipline" of Brinkman by the defendant and to bar any mention of Brinkman's consumption of alcohol. The defendant also asked to bar evidence that Brinkman "may have been known as one who was prone to hug other persons." The trial court reserved its ruling on this issue.

¶ 28    A few days later, the plaintiff informed the trial court that she was dismissing count III. Reversing her previous position, the plaintiff then moved to bar all evidence of Brinkman's misconduct on other occasions, "including unwanted contact, flirtation, advances, touching *** whether before or after the accident." The defendant did not object, and the trial court granted the plaintiff's motion *in limine*.

¶ 29    Prior to trial, the plaintiff filed an agreed "plaintiff's statement of the case," stating that she "maintain[ed] that she was injured while serving at the event *** when *** Brinkman[ ] picked her up and caused her to fall to the ground."

¶ 30    The trial commenced on September 17, 2012, on the sole remaining claim: that the defendant should be held vicariously liable for Brinkman's conduct that caused the plaintiff's injuries. The first witness for the plaintiff was Valicenti. After the plaintiff's attorney had begun to elicit testimony from Valicenti about the Jaycees' methods of recruiting new members, the defendant objected and asked for a sidebar. The defendant objected that the plaintiff had never disclosed that she would be presenting any evidence suggesting that the accident "was somehow associated with recruitment." The trial court eventually overruled the objection and Valicenti's direct examination continued.

¶ 31    The second sidebar at issue occurred during the cross-examination of Valicenti.[1] The defendant's attorney indicated that he wished to elicit testimony regarding the fact that, before Brinkman started work in the beer tent on the evening of the accident, Valicenti had instructed him not to touch anyone. The defendant sought the trial court's permission to inquire, because the court had stated that it would decide the admissibility of such evidence at trial. The plaintiff objected on the ground that such testimony would indicate that Brinkman was treated differently than other volunteers because of his prior bad acts, and testimony about his prior bad acts had been barred.

¶ 32    The trial court said that it thought it had ruled on the issue. The defendant pointed out that the ruling had occurred when the plaintiff moved to vacate the trial court's previous order on the issue, and that Valicenti's instruction to Brinkman was the type of evidence that the trial court ruled it might admit, depending on the course of the trial. The defendant then argued that Valicenti's instruction that Brinkman should not touch anyone had become highly relevant in light of the plaintiff's theory that the Jaycees encouraged hugging among their members. The trial court stated that, if it allowed the testimony the defendant wanted to elicit, then it would also have to allow the plaintiff to inquire about why Brinkman was given that instruction, which it believed would reopen "an issue that I had previously resolved in your favor." The trial court therefore barred the inquiry into Valicenti's instruction to Brinkman. The plaintiff rested her case after presenting testimony by Valicenti, herself, and her treating physician, Dr. George Nahra (by reading his evidence deposition into the record).

¶ 33    The defendant moved for a directed verdict, arguing that the plaintiff had not presented evidence that the accident was caused by conduct within the scope of Brinkman's employment. Referring to the three-part test from the Second Restatement of Agency (Restatement) (Restatement (Second) of Agency § 228 (1958)), adopted in *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 164 (2007), the defendant argued that two of the three requirements were not met: the plaintiff had not shown (1) that Brinkman's conduct in picking her up was "of the kind he [was] employed to perform," or (2) that Brinkman's conduct was motivated even partly by a desire to serve the defendant. As to the last of these requirements, the defendant argued that the plaintiff had presented no evidence whatsoever about Brinkman's motivation for his acts. The trial court denied the motion, stating that the circumstantial evidence that the Jaycees commonly hugged each other at events (and so Brinkman's hug was a foreseeable occurrence) could support an inference that Brinkman's conduct was in part motivated by a desire to serve the defendant.

¶ 34    After the trial court denied its motion for a directed verdict and prior to the start of its case, the defendant asked the trial court once again to allow it to call Valicenti to testify regarding her instruction to Brinkman not to touch anyone. The defendant argued that the plaintiff's theory that "the Jaycees is a huggin' organization was never pled and was never disclosed," and that the defendant was entitled to present Valicenti's testimony to counter this theory. The

---

[1]For some reason, this portion of the transcript was not included in the report of proceedings. However, it is contained in the common-law record, having been filed in connection with the posttrial motion.

trial court reviewed the allegations of the amended complaint and concluded that it adequately put the defendant on notice that some type of physical contact by Brinkman was at issue. The trial court then declined to allow the defendant to present Valicenti's testimony:

"That being said, I'm going to again deny your request to get into prior acts because if I were to do that, I think I'd guarantee a mistrial *** based on my prior ruling.

So I'm–I'm not going to permit you to do what I have denied the plaintiff the ability to do."

Trial then resumed with the defendant's case, which included the testimony of Brophy and the video deposition of Dr. Antonio Yuk, the defendant's expert witness regarding the plaintiff's injuries.

¶ 35    Prior to resting, the defendant made an offer of proof regarding Valicenti's likely testimony about her instruction to Brinkman at the start of his shift in the beer tent on the night of the accident. The defendant read into the record a portion of Valicenti's deposition testimony, in which Valicenti stated that, "before the incident," she spoke with Brinkman about not "touching people"–not only women, but anybody. When asked why she told Brinkman specifically not to touch anybody, Valicenti said, "[Brinkman] is a gregarious and friendly physical contact kind of person." The trial court reiterated that it believed that the defendant's attorney had "previously asked this court to bar reference to prior bad acts of Mr. Brinkman" and that it had granted that request:

"So from my perspective, *** I couldn't allow you to introduce evidence that touched on prior acts while at the same time barring plaintiff from introducing evidence that touched on prior acts of Mr. Brinkman.

So I–yes, it *** is preventing you from introducing evidence that he was specifically warned not to touch. But you ultimately, as I see it, *** that is as a direct result of the request that *** you or your predecessor filed with this court. So from my perspective, you can't have it both ways.

So I–I don't see any other way to resolve the conflict other than to bar her from testifying as to what you just offered by way of an offer of proof from her deposition ***."

¶ 36    Following closing arguments, the jury returned a verdict finding the defendant vicariously liable for the plaintiff's injuries and awarding her damages of $253,051.69 plus costs. In addition to the general verdict forms, the jury also received special interrogatory forms asking it to make specific findings as to whether Brinkman's conduct (1) "was of the kind he was employed to perform or reasonably could be said to have been contemplated as part of his employment"; (2) was "motivated, at least in part, by a purpose to serve the Crystal Lake Jaycees"; and (3) took place substantially within the time and space limits of his employment duties. The jury answered "yes" to each of these special interrogatories.

¶ 37    The defendant filed a timely posttrial motion for judgment notwithstanding the verdict (judgment *non obstante veredicto*, or judgment *n.o.v.*) or, in the alternative, for a new trial. The defendant argued that the verdict was against the manifest weight of the evidence, as the plaintiff had not proven the elements necessary for vicarious liability. It also argued that the

trial court had erred in permitting the plaintiff to elicit testimony on undisclosed topics (the Jaycees' alleged use of hugging to promote camaraderie and to recruit new members) and in barring the defendant from eliciting Valicenti's testimony that, before the accident, she instructed Brinkman not to touch anyone.

¶ 38 The trial court denied the posttrial motion. As to its rulings barring the defendant from presenting Valicenti's testimony that she told Brinkman not to touch anyone, the court commented that the testimony would have been relevant and important to the defendant's case and that it continued to be "troubled" by the issue. However, it continued, it could not have permitted the testimony without also allowing the plaintiff to inquire about the reason Valicenti said this to Brinkman (Brinkman's huggy nature), and it had already barred such inquiry at the defendant's request. The defendant appealed.

¶ 39 II. ANALYSIS

¶ 40 On appeal, the defendant raises several challenges to the judgment. It first contends that the trial court erred in denying the motions for a directed verdict and for judgment *n.o.v.*, because the plaintiff failed to present a *prima facie* case of vicarious liability. The defendant also contends that the trial court should have granted its motion for a new trial because of certain errors in the trial court's evidentiary rulings. As we agree with the defendant's first argument, we do not reach the second.

¶ 41 A. General Principles

¶ 42 At the close of the plaintiff's case, the defendant moved for a directed verdict, arguing that the plaintiff had failed to present a *prima facie* case that it should be held vicariously liable for Brinkman's conduct. The defendant also moved, posttrial, for a judgment *n.o.v.* on the same ground. The trial court denied both motions. The defendant contends that both rulings were error.

¶ 43 A motion for a directed verdict will be granted only where "all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). A directed verdict may be granted to a defendant where the plaintiff has failed to make out a *prima facie* case; that is, the plaintiff has failed to present at least some evidence on every necessary element of his or her cause of action. *Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 17. "In ruling on a motion for a directed verdict[,] 'a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion.' " *Id.* (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992)). Although a motion for a directed verdict and a motion for judgment *n.o.v.* are made at different times, they raise the same issues and are governed by the same standards. *Gustafson*, 151 Ill. 2d at 453 n.1.

¶ 44 The test for vicarious liability found in the Restatement was formally adopted by our supreme court in *Bagent*, 224 Ill. 2d at 164. That test asks three questions. First, was the conduct of the employee of the kind that he or she is ordinarily employed to perform?

- 9 -

Second, did the employee's conduct occur substantially within the time and place of his or her employment? Third, was the employee's conduct motivated, partly or wholly, by a purpose to serve the employer? *Id*. All three of these criteria must be met to hold the employer vicariously liable for the employee's conduct, and the plaintiff bears the burden of proving that all of the requirements are met. *Id*. at 165.[2]

¶ 45     Applying this test in the context of the defendant's motions for a directed verdict and a judgment *n.o.v.*, the question becomes whether the evidence presented by the plaintiff, when viewed most favorably to the plaintiff, was totally lacking on any of the three requirements. See *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). It is undisputed that Brinkman's conduct toward the plaintiff occurred during the time and at the place of his employment as an Oktoberfest volunteer. Thus, the issue is whether the plaintiff presented sufficient evidence to make out a *prima facie* case as to both of the other two requirements: that Brinkman's conduct was of the type he was employed to perform and that, in picking up the plaintiff, he was motivated partly or wholly by a desire to serve the defendant's interests rather than by personal desire or whim.

¶ 46     Like the parties' arguments, our analysis of these issues relies heavily on two recent supreme court cases involving vicarious liability. The first case is *Bagent*, which involved a hospital employee's disclosure of confidential medical information to the sister of a patient. The hospital had a policy of protecting confidential medical information (as required by federal law) and trained its employees that such information should not be disclosed to anyone outside of the medical staff caring for the patient, not even the patient's family. *Bagent*, 224 Ill. 2d at 157-58. The employee at issue acknowledged that she knew the hospital's policy. However, when she saw the patient's sister (who was also her best friend) at a bar, she mentioned that the patient was pregnant. The patient's sister had not been aware of the pregnancy before that, and the employee testified that she immediately realized that she should not have shared the information with the sister. *Id*. at 158.

¶ 47     The patient sued the employee and also the hospital, claiming vicarious liability. The trial court granted summary judgment in favor of the hospital, holding that the evidence showed that, when the employee disclosed the confidential information, she was acting outside the scope of her employment. *Id*. at 160-61. The plaintiff appealed and the appellate court reversed the grant of summary judgment. Although the appellate court found that the evidence showed that the disclosure was not the kind of conduct the employee was employed to perform, it believed there was a question of fact about whether the disclosure was motivated, at least in part, by a purpose to serve the hospital. *Id*. at 161.

---

[2]We note that, in discussing these requirements, we use the terms "employment," "employee," and "employer" broadly to include the scenario present here, in which the "employee" is an unpaid volunteer performing services for a nonprofit organization. There is no dispute that a volunteer's conduct can give rise to vicarious liability. *Alms v. Baum*, 343 Ill. App. 3d 67, 71 (2003) (fact that allegedly negligent person was a "volunteer worker for a charitable organization does not necessarily preclude a finding" of an employment relationship between the worker and the organization).

¶ 48 The hospital appealed to the supreme court. Adopting the three-part test of the Restatement, the supreme court held that all three requirements must be satisfied in order to create vicarious liability. *Id*. at 165. The supreme court then analyzed the evidence as to each requirement to determine whether summary judgment was appropriate. As to whether the disclosure was the kind of conduct that the employee was employed to perform, the supreme court found that it was not, as the employee was a phlebotomist whose job was to draw blood and keep records. No part of her job included disclosing confidential information to nonmedical personnel. *Id*. at 167. The fact that the hospital explicitly forbade such disclosure was relevant evidence that confirmed the conclusion that the employee's act was not the type of conduct that the employee was employed to perform. *Id*. at 168.

¶ 49 Turning to the third criterion, the employee's motivation for the conduct, the supreme court found that the appellate court had improperly focused on the interests of the *employer* when it found that the employee's duty of nondisclosure was " 'actuated by the needs and requirements of the employer.' " (Emphasis omitted.) *Id*. at 169 (quoting *Bagent v. Blessing Care Corp.*, 363 Ill. App. 3d 916, 924 (2006)). The supreme court held that this approach was incorrect and that, for this criterion, "it is the *state of mind of the employee* that is material." (Emphasis in original.) *Id*. at 170. The supreme court then found that there was no material dispute that the employee was not motivated, even partly, by a desire to serve the hospital, because the employee herself had testified that she simply spoke out of an assumption that the patient had already shared the information with her sister. The supreme court noted that, in the ordinary case in which there was no direct evidence of the employee's intent, that intent could be gleaned "from the manifestations of the employee and the surrounding circumstances." *Id*. The fact that the employer forbade the employee to engage in the complained-of conduct would be a relevant circumstance to consider in determining the employee's intent, as it would make it less likely that the employee's conduct was motivated by a desire to serve the employer. *Id*.

¶ 50 The supreme court in *Bagent* therefore reversed the appellate court and affirmed the trial court's grant of summary judgment for the hospital. *Id*. at 172. (The supreme court did not address the second requirement–that the disclosure was made within the time and place of employment–because it was clear that neither the first nor the third requirement was met.)

¶ 51 The supreme court issued the second leading case on vicarious liability, *Adames v. Sheahan*, 233 Ill. 2d 276 (2009), two years after *Bagent*. *Adames* involved the accidental killing of the plaintiffs' son when his friend, the son of a sheriff's deputy, found three of the deputy's guns in the house and discharged one of them toward the plaintiffs' son while they were playing. The plaintiffs sued (among others) the sheriff, arguing that he should be held vicariously liable because the deputy's keeping of the guns in his home was related to his employment. As in *Bagent*, the trial court entered summary judgment in favor of the employer; the appellate court affirmed in part and reversed in part; and the case went to the supreme court. *Id.* at 290-95.

¶ 52 Applying the three-part Restatement test, the supreme court found that the sheriff was not vicariously liable for the deputy's conduct. *Id*. at 303-04. As to the first requirement, the supreme court found that the deputy's negligent storage of his guns was not the kind of

- 11 -

conduct he was employed to perform. Although at one time the deputy had been required to carry a gun at work and had owned one of the guns for that purpose, at the time of the accident he was not required to, and did not, carry a gun for employment purposes. *Id*. at 304. The fact that the deputy's negligence was foreseeable by the sheriff–the sheriff's office trained deputies in the proper storage of guns at home and disciplined deputies for improper storage–would have been relevant if the deputy were required to carry a gun for work, but as he was not, the first requirement was not met. *Id*. at 304-05. Similarly, although the deputy was required to be certified annually in the use of a firearm, he did not need to own a gun in order to be certified, and thus the deputy's ownership of the guns was not required by the sheriff. *Id*. at 304.

¶ 53    The second requirement–that the complained-of conduct occurred within the time and place limits of the employment–also was not met: the negligent storage of the guns occurred at the deputy's home, and unlike the defendant police officer in a similar case upon which the appellate court had relied (*Gaffney v. City of Chicago*, 302 Ill. App. 3d 41 (1998)), the deputy was not on call 24 hours per day and was not required to attempt to stop a crime even when off duty. *Adames*, 233 Ill. 2d at 304-05.

¶ 54    Finally, there was no evidence that the deputy was motivated "by a desire to serve his employer when he negligently stored his gun." *Id*. at 305. The deputy had testified that he kept the guns at home for his own protection and in case he needed them in the future. *Id*. In this respect, the case again differed from *Gaffney* because the police officer in *Gaffney* testified that he kept his gun in an unlocked cabinet in his home so that he could respond quickly in the event of an emergency, including one related to his employment as a police officer. *Id*. For all of these reasons, the deputy was not acting within the scope of his employment when he negligently stored the guns in his home, and the sheriff could not be held vicariously liable for that conduct. *Id*. at 306.

¶ 55    *Bagent* and *Adames* contain the most recent guidance from the supreme court on the subject of vicarious liability. We note that the parties to this appeal also cite several earlier cases in their arguments. While there is no doubt that many of those earlier cases remain good law to the extent that they are consonant with *Bagent* and *Adames*, to the extent that they apply a different analysis we must follow the controlling cases of *Bagent* and *Adames*. We therefore look primarily to *Bagent* and *Adames*, along with any relevant later cases, in deciding this appeal.

¶ 56          B. Whether Brinkman's Conduct Was of the Kind He Was Employed to Perform

¶ 57    The first requirement of the Restatement's three-part test asks a court to determine, as a factual matter, "whether the complained-of act of the employee, although not authorized by the employer, is nevertheless so similar or incidental to employer-authorized conduct as to be within the scope of employment." *Bagent*, 224 Ill. 2d at 166. Thus, even if Brinkman's acts of hugging the plaintiff and picking her up were not among his authorized job duties, vicarious liability might properly be imposed if the acts were sufficiently "similar or incidental to" his assigned duties.

¶ 58     In considering this issue, we note that the supreme court, in both *Bagent* and *Adames*, began by looking at the tasks the employee was required to perform as part of his or her regular job duties, and then compared the complained-of conduct with those duties. See *id.* at 167 (listing the employee's typical daily tasks as a phlebotomist and concluding that she was "not employed to divulge confidential patient information while off duty and after hours in a tavern"); *Adames*, 233 Ill. 2d at 303-04 (noting testimony that correctional officers such as the deputy were not required to own or carry guns and did not need weapons to perform their duties, and finding that the deputy's "negligent storage of his guns was not the kind of conduct [he] was employed to perform, nor was it incidental to his employment"). Here, there is no dispute that the tasks that Brinkman was required to perform at the Oktoberfest were limited to pouring or serving cups of beer. Although there was copious testimony that the defendant was a "huggy" organization whose members commonly greeted one another with hugs, the record is clear that such hugs were not required as part of the job duties that Jaycee volunteers were assigned to perform that night. (At oral argument, the plaintiff's attorney stated that hugging was one of the founding purposes of the Jaycees, but we regard this statement as an unwarranted exaggeration of the evidence that, in general, the defendant encouraged the strengthening of social bonds among its members.) Brophy testified that the defendant had no policy of promoting hugging among its members, and Brophy, Parks, and Valicenti all testified that they greeted some Jaycees with hugs but did not hug others. All of them testified that the hugs they exchanged with other Jaycees were based on their closeness to those Jaycees, not on any organizational requirement. None of these witnesses testified that hugging other volunteers was part of their assigned job duties at the Oktoberfest. Finally, there was absolutely no evidence that Brinkman's conduct of lifting the plaintiff into the air following their hug was part of his assigned job duties that night.

¶ 59     Thus, it is clear that Brinkman's conduct at the time of the accident was outside of his assigned job duties. We therefore turn to the question of whether the plaintiff produced evidence that Brinkman's conduct toward her (hugging her and lifting her off the ground) was "so similar or incidental to" his assigned job duties that vicarious liability should be imposed. See *Bagent*, 224 Ill. 2d at 166. In considering this question, we bear in mind that "an act is outside of the scope of employment if it has no connection with the conduct the employee is required to perform." *Id*. at 168.

¶ 60     The plaintiff argues that conduct "similar or incidental to" employer-authorized conduct includes any conduct that "reasonably could be said to have been contemplated as part of" the employment, citing the relevant jury instruction (Illinois Pattern Jury Instructions, Civil, No. 50.06.01 (2011)). While we acknowledge that the jury instruction indeed contains that phrase, we also note that the sole citation for that instruction is *Bagent* (see *id*., comment), and that *Bagent* itself does not contain that phrase or any variant of it. Accordingly, we decline to adopt this phrase as the appropriate standard.

¶ 61     The plaintiff also argues that we should look to the factors enumerated in section 229 of the Restatement (Restatement (Second) of Agency § 229(2)(a) (1958)), which include such factors as "whether or not the act is one commonly done" by employees like the one who caused the injury and whether the employer had reason to expect that the particular act would

be done. These factors suggest a broader standard under which an employer may be held vicariously liable if it reasonably should have foreseen that its employee might engage in the complained-of conduct.

¶ 62 It is unclear whether the supreme court has in fact approved this broader standard. In *Bagent*, the court suggested that the factors in section 229 could be considered in determining whether the complained-of conduct was within the scope of employment. *Bagent*, 224 Ill. 2d at 166. However, the court did not itself apply those factors in *Bagent* to determine whether the complained-of conduct was "of the kind" that the employee was employed to perform. Moreover, the supreme court appeared to reject this broader foreseeability approach in *Adames*. In that case, there was evidence that the sheriff could have foreseen (and in fact did foresee) that deputies might store guns improperly in their homes, because the sheriff provided training on the proper storage of guns and had adopted a policy of disciplining employees who stored guns improperly. *Adames*, 233 Ill. 2d at 304. However, the court found that the foreseeability of the deputy's negligent storage of his guns was not relevant, because the deputy was not required to own a gun at all for his employment. *Id.* Applying a similar analysis here, Brinkman was not required to hug anyone at all as part of his employment, and so the fact that the defendant might have "ha[d] reason to expect that such an act [would] be done" (Restatement (Second) of Agency § 229(2)(f) (1958)) was not relevant in determining whether his conduct was "of the kind" he was employed to perform.

¶ 63 However, even if this broader standard of foreseeability were applied here, the plaintiff has not presented evidence that Brinkman's conduct met this standard. While his act of hugging the plaintiff might have been foreseeable by the defendant, given that Jaycees customarily greeted each other in a friendly manner, there was no evidence that the defendant had "reason to expect" Brinkman's act of lifting the plaintiff off the ground. As identified by the plaintiff in her complaint and her initial descriptions of the accident, Brinkman's lifting of her, not the initial hug, was the act that caused her injury. There was no evidence that Brinkman's act of hoisting the plaintiff into the air was a foreseeable outgrowth of his duties, or even that it was a foreseeable extension of the hug. The plaintiff herself testified that this was an unusual act by a Jaycee; indeed, she had never experienced this or seen other Jaycees greet each other this way. Accordingly, we reject the argument that the plaintiff presented evidence that the defendant had reason to expect Brinkman's conduct. The jury's finding that the conduct that caused the injury was "of the kind" he was employed to perform was against the manifest weight of the evidence.

¶ 64 C. Whether Brinkman's Conduct Was Motivated by a Desire to Serve the Defendant

¶ 65 Regardless of whether the plaintiff made out a *prima facie* case as to the first requirement (that Brinkman's conduct was "of the kind" he was employed to perform), the plaintiff also was required to present evidence to meet the third requirement for vicarious liability–that Brinkman's conduct was motivated, either partly or wholly, by a desire to serve the defendant. *Bagent*, 224 Ill. 2d at 165 (all three requirements of the three-part test must be met in order to impose vicarious liability). A plaintiff may present either direct or circumstantial evidence of this motivation. *Id.* at 170. However, the plaintiff may not rely on evidence about

*the employer's* needs or interests, but must offer evidence of *the employee's* own state of mind. *Id*.

¶ 66    Here, the sole evidence of Brinkman's motivation offered by the plaintiff was the evidence that Jaycees sometimes hugged one another in greeting. The plaintiff and Valicenti stated that they believed that such hugs advanced the purposes of the organization by showing that it was a friendly and welcoming group. However, neither of them testified that she herself, when she hugged other Jaycees, was motivated by a desire to advance the interests of the Jaycees. To the contrary, they both testified that they hugged other Jaycees whom they knew well, and did not hug all Jaycees. Brophy testified similarly. The implication of this testimony is that the witnesses' own motivation in hugging other Jaycees was personal: they wanted to express their closeness to particular people. Where an employee's conduct is actuated by a personal purpose rather than a purpose to serve the employer, it is not within the scope of employment. *Id*. at 169-70; *cf. Deloney v. Board of Education of Thornton Township*, 281 Ill. App. 3d 775, 783-86 (1996) (collecting cases expressing the general rule that acts of sexual misconduct are viewed as having been undertaken solely for the employee's personal reasons). Moreover, even if there was testimony that *some* Jaycees intended to advance the defendant's interests when they hugged other Jaycees, that testimony would do nothing to establish that *Brinkman* was himself motivated by a desire to serve the defendant when he hugged and picked up the plaintiff.

¶ 67    The plaintiff argues that she was not required to call Brinkman as a witness in order to establish that his acts were motivated, at least in part, by a desire to serve the defendant. This is certainly true: intent or motivation can be proved by circumstantial evidence as well as direct evidence. *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 44. Here, however, the plaintiff presented no evidence, either circumstantial or direct, about Brinkman's actual motivation for hugging and picking up the plaintiff. Her argument that, given the Jaycees' interest in maintaining a welcoming and friendly environment, Brinkman *could* have been motivated by a desire to serve the defendant is simply speculation. Speculation cannot take the place of evidence. *Billman v. Frenzel Construction Co.*, 262 Ill. App. 3d 681, 687 (1993) (summary judgment proper where speculation would be necessary to establish element of plaintiff's claim).

¶ 68    In arguing that she presented a *prima facie* case on this requirement, the plaintiff cites to numerous cases decided before *Bagent* and *Adames* were issued. However, in addition to being distinguishable to the extent that they applied a different analysis instead of the three-part Restatement test, none of these cases discusses the third requirement at issue here: the employee's own motivation for his or her conduct. Accordingly, the plaintiff's reliance on them is misplaced.

¶ 69    Our conclusion that Brinkman's conduct was not within the scope of his employment is bolstered by evidence that we believe was improperly excluded by the trial court–Valicenti's testimony that, a few hours before the accident, she told Brinkman not to touch anyone at the Oktoberfest. The trial court barred the defendant from eliciting this testimony because it believed that allowing the testimony to come in would prejudice the plaintiff, given the

court's prior rulings barring evidence of Brinkman's past misconduct. We think that the trial court erred in reaching this conclusion.

¶ 70    "The basic rule is that all relevant evidence is admissible unless otherwise provided by law." *People v. Cruz*, 162 Ill. 2d 314, 348 (1994). Relevant evidence is any evidence that tends to make the existence of any fact material to the determination of the case either more probable or less probable. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). In *Bagent*, the supreme court made it clear that the type of evidence at issue here is relevant in determining whether vicarious liability should be imposed on an employer. *Bagent*, 224 Ill. 2d at 168, 170 (that an employer forbade certain conduct is relevant to two requirements of the three-part test for vicarious liability: whether the employee's wrongful act was the kind of act that he or she was employed to perform, and whether the employee's wrongful act was motivated by a desire to serve the employer). Thus, Valicenti's testimony that she told Brinkman not to touch anyone on the night of the accident was unquestionably relevant to the vicarious liability analysis. The exclusion of this evidence seriously damaged the defendant's ability to defend against the vicarious liability claim.

¶ 71    Moreover, the exclusion of this highly relevant evidence was not necessary to avoid unfair prejudice to the plaintiff. First, according to Valicenti's deposition testimony, her instruction to Brinkman contained no express reference to any previous bad behavior by Brinkman: Valicenti simply told Brinkman not to touch anyone. The trial court could easily have permitted the introduction of this testimony without allowing inquiry into the reason for the instruction. It was not as if either party wanted or needed to introduce evidence of Brinkman's past misconduct; the plaintiff herself had moved successfully to bar such evidence, and indeed such evidence was irrelevant to the elements of vicarious liability. Second, the plaintiff does not identify any way in which the admission of the testimony at issue would have unfairly prejudiced her. *Cf. Harvey*, 211 Ill. 2d at 392 (a trial court may exclude evidence that is remote, uncertain, or unfairly prejudicial). Although the testimony would have strengthened the defendant's case and damaged her own, this is a natural effect of relevant evidence, and is not in itself a reason to bar that evidence. Finally, the timing of the evidence would not have prejudiced the plaintiff. The defendant first asked to elicit this evidence during its cross-examination of Valicenti. As Valicenti was the plaintiff's first witness, the plaintiff would have had ample opportunity to make her own case thereafter.

¶ 72    While we give proper deference to the trial court's inherent power to control the presentation of evidence at trial, the exclusion of relevant evidence must rest on some legally sufficient ground. *Cruz*, 162 Ill. 2d at 348; see also *People ex rel. Noren v. Dempsey*, 10 Ill. 2d 288, 293 (1957) ("The basic principle that animates our law of evidence is that what is relevant is admissible. Exceptions to that principle must justify themselves."). Here, no such legally sufficient basis for excluding the evidence has been identified. Thus, the trial court erred in excluding Valicenti's testimony that she told Brinkman not to touch anyone. Had the evidence come in, it would have provided additional support for our conclusion that Brinkman's conduct was not within the scope of his employment by the defendant.

¶ 73    In summary, the plaintiff failed to put forward a *prima facie* case for imposing vicarious liability on the defendant. *Bagent*, 224 Ill. 2d at 165 (all three requirements of the three-part

test must be met in order to impose vicarious liability). A directed verdict or a judgment *n.o.v.* may be granted to a defendant where the plaintiff has failed to make out a *prima facie* case; that is, the plaintiff has failed to present at least some evidence on every necessary element of his or her cause of action. *Hemminger*, 2014 IL App (3d) 120392, ¶ 17. As the plaintiff did not present evidence of either the first or the third requirement of the three-part test for vicarious liability, we find that the trial court erred in denying the defendant's motions for a directed verdict and judgment *n.o.v.*

¶ 74                                                            III. CONCLUSION

¶ 75        The judgment of the circuit court of McHenry County is reversed, and judgment is entered in favor of the defendant, the Crystal Lake Jaycees.

¶ 76        Reversed.