DAVID ALMS, Independent Adm'r of the Estate of Steven Berger, Deceased, *et al.*, Plaintiffs-Appellants, v. DANIEL BAUM *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—01—2384

Opinion filed September 5, 2003.

68

Salvi, Schostok & Pritchard, P.C., of Waukegan (Michael P. Schostok and Scott R. Clewis, of counsel), and Law Offices of Robert G. Black, of Naperville (Robert G. Black, of counsel), for appellants.

Sanchez & Daniels, of Chicago (Manuel Sanchez, Howard E. Rosenblum, and Nilgun Aykent Zahour, of counsel), for appellees.

JUSTICE REID delivered the opinion of the court:

The decedent, Steven Berger, and appellant Susan Delanty were passengers in a two-seater sports car that was driven by defendant Daniel Baum (Baum), when he lost control of the vehicle and had an accident. Delanty and appellant David Alms, who is serving as the independent administrator of the estate of the deceased Berger, filed

suit against Baum and defendant Ronald McDonald House Near Children's Memorial Hospital (Ronald McDonald House), based on a theory of *respondeat superior*. Ronald McDonald House subsequently filed a motion for summary judgment, which the trial court granted. On appeal, the appellants argue that the trial court erred when it determined that Baum was not acting as an agent of the Ronald McDonald House when the accident occurred. For the reasons that follow, we affirm the decision of the trial court.

## BACKGROUND

On March 10, 1998, Alms and Delanty filed a 16-count complaint for wrongful death, a survival action and negligence against Baum and the Ronald McDonald House. The complaint alleged that on June 7, 1997, Berger and Delanty were passengers in Baum's automobile when he lost control of it and had an accident while negotiating a curve on a roadway in Williams Bay, Wisconsin. Berger was killed and Delanty suffered permanent injuries. The plaintiffs sought to recover damages.

From discovery deposition testimony, it was learned that beginning in 1978, Children's Oncology Services of Illinois, a nonprofit corporation, owned and operated a children's cancer summer camp, "One Step At A Time Camp," at George Williams College in Wisconsin. During the 1990s, Children's Oncology Services of Illinois changed its name to the Ronald McDonald House. The camp was founded by Edward Baum, M.D. (Dr. Baum), who served as its director from 1971 until his retirement in July 1997.

Each year since 1979, the camp conducted an orientation weekend for camp workers before the actual start of summer camp. The purpose of the weekend was to: (1) provide orientation and training for new and existing staff members and (2) organize and plan for the upcoming two-week camp session. Attendance at the orientation weekend was mandatory for administration staff, camp leaders and counselors.

Also, camp leaders and administrators held four organizational meetings during the year. The last of those meetings was held on the night of Friday, June 6, 1997. Attendance at the Friday night meeting was mandatory for camp leaders as well. The following day, on Saturday June 7, 1997, the two-day orientation weekend was scheduled to begin.

Although rooms were made available to camp leaders, Dr. Baum testified that if they chose to do so, camp leaders could leave the camp on Friday night and return the following morning. Dr. Baum testified that he would have objected to camp leaders drinking alcohol after the Friday night meeting because they were not supposed to drink when they were at camp regardless of whether they were on camp premises

or elsewhere. Dr. Baum also said that he believed he had the right to tell camp leaders that they could not go to a local establishment and drink an alcoholic beverage. However, Dr. Baum admitted that there was no written policy or rule that prohibited camp leaders from drinking alcohol after the Friday night meeting.

Berger, Baum and Delanty served as camp leaders. Camp leaders were unpaid volunteers who were responsible for providing their own transportation to and from camp. However, camp leaders would be reimbursed for traveling expenses that they incurred during the camp.

As camp leaders, Berger, Baum and Delanty attended the mandatory Friday night meeting. Dr. Baum testified that the meeting was scheduled to start at around 6:30 p.m. or 7 p.m. When the meeting ended around 9:30 p.m., a group of people who attended the meeting, which included Berger, Baum and Delanty, decided to go to a local establishment called the Keg Room.

After the Friday meeting ended, Dr. Baum testified, official camp business for the camp leaders would not begin again until the following Saturday morning. Dr. Baum testified that any camp business that took place between the camp leaders after the Friday meeting had concluded and before Saturday morning occurred at the election of the camp leaders.

Several leaders testified that going out as a group to the Keg Room or some other local establishment after the Friday night meeting had been a regular practice for years. It was also common for camp business to be discussed during these times. After the Friday meeting, Delanty brought materials from the camp with her to the Keg Room and worked on camp business while there. However, Baum and Berger did not bring any materials from camp to work on. Instead, Baum and Berger watched a basketball game on television and socialized while they were at the Keg Room.

Delanty, Berger and Baum were at the Keg Room for approximately two hours. Delanty testified that she, Berger and Baum were the last three to leave. Baum, who was leasing a two-seater sports car, offered to drive the three back to camp. Delanty sat on Berger's lap in the passenger seat of Baum's car. As they were returning to the camp, Baum, who testified that he drank five beers while at the Keg Room, lost control of the car and had an accident.

On March 10, 1998, Alms and Delanty filed suit against Baum and Ronald McDonald House. On January 22, 2001, Ronald McDonald House filed a motion for summary judgment, which the trial court granted on May 14, 2001. Subsequently, the appellants timely filed a notice of appeal on June 14, 2001.

## ANALYSIS

The question that must be resolved is whether Baum was acting as an agent of Ronald McDonald House when the accident occurred.

■ Summary judgment is proper where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000); *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001). In appeals from summary judgment rulings, our review is *de novo*. *Travelers*, 197 Ill. 2d at 292.

■ Under the doctrine of *respondeat superior*, an employer can be held vicariously liable for the tortious acts of its employees (*Pyne v. Witmer*, 129 Ill. 2d 351, 359 (1989)), including negligent, wilful, malicious, or even criminal acts of its employees when such acts are committed in the course of employment and in furtherance of the business of the employer (*Brown v. King*, 328 Ill. App. 3d 717, 722 (2001)).

■ The status of a negligent person as a volunteer worker for a charitable organization does not necessarily preclude a finding that a master-servant relationship existed between the organization and the volunteer. *Morgan v. Veterans of Foreign Wars*, 206 Ill. App. 3d 569, 575 (1990), citing *Baxter v. Morningside, Inc.*, 10 Wash. App. 893, 521 P.2d 946 (1974), and A. Manley, *Annotation, Liability of Charitable Organization Under Respondeat Superior Doctrine For Tort of Unpaid Volunteer*, 82 A.L.R.3d 1213 (1978). " 'One who volunteers services without an agreement for or expectation of reward may be a servant of the one accepting such services.' " *Morgan*, 206 Ill. App. 3d at 575, quoting Restatement (Second) of Agency § 225 (1958).

■ A servant is one whose physical conduct in performing the services is subject to the master's control or right to control. *Morgan*, 206 Ill. App. 3d at 575-76, citing Restatement (Second) of Agency § 220 (1958). Factors in determining whether one is a servant include the extent of control by the employer over the work. *Morgan*, 206 Ill. App. 3d at 576, citing *Warren v. LeMay*, 142 Ill. App. 3d 550, 575 (1986). " 'To constitute the relation of master and servant, the one for whom the service is rendered must consent or manifest his consent to receive the services as a master.' " *Morgan*, 206 Ill. App. 3d at 576, quoting Restatement (Second) of Agency § 221 (1958).

"The Restatement defines a servant as a type of agent 'employed by a master to perform service in his affairs whose *physical conduct* in the performance of the service is controlled or is subject to the right to control by the master.' (Emphasis added.) Restatement (Second) of Agency § 2(2), at 12 (1958). Although the right to control the physical conduct of the person giving services most often determines whether

the relationship of master and servant exists, the right to control may be attenuated. Restatement (Second) of Agency § 220, Comment *d*, at 487 (1958). In addition, a number of other factors may play a role in establishing the master-servant relationship. Restatement (Second) of Agency § 220 (1958). Ultimately, '[t]he relation of master and servant is one not capable of exact definition' (Restatement (Second) of Agency § 220, Comment *c*, at 486 (1958)), and it is generally left to the trier of fact to determine whether the relationship exists (Restatement (Second) of Agency § 220, Comment *c*, at 486-87 (1958)). See also *Merlo v. Public Service Co.*, 381 Ill. 300, 319-20 (1942) ("The question as to whether or not the relationship of master and servant exists is dependent upon certain facts and circumstances. These facts include the question of the hiring, the right to discharge, the manner of direction of the servant, the right to terminate the relationship, and the character of the supervision of the work done. Unless these facts clearly appear, the relationship cannot become purely a question of law')." *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 235 (2000).

In *Hills*, the plaintiff, John Hills, was attacked and beaten while coaching for a little league baseball team. Hills' attackers were the manager, Ted Loy, and assistant coaches, George Loy, Sr., and George Loy, Jr., for the opposing team. Hills and his wife subsequently sued the Loys, Bridgeview Little League Association (Bridgeview), which was the sponsor of the opposing team, and Justice Willow Springs Little League (Justice), which hosted the baseball tournament where the attack occurred. The Hills alleged, *inter alia*, that Bridgeview negligently failed to supervise and control the Loys. *Hills*, 195 Ill. 2d at 225-26.

It was learned at trial that the team manager, Ted Loy, was a volunteer for Bridgeview. Ted Loy appointed George Loy, Sr., and George Loy, Jr., as assistant coaches. *Hills*, 195 Ill. 2d at 224-25.

After Bridgeview learned of Ted Loy's attack on Hills, the Bridgeview governing board barred him from the Little League. Because George Loy, Sr., and George Loy, Jr., were not members of Bridgeview, the board could not take any action against them. *Hills*, 195 Ill. 2d at 225.

Following trial, the jury returned verdicts in favor of the plaintiffs. The trial court denied Bridgeview's and Justice's motions for judgment notwithstanding the verdict or for a new trial. On appeal, Bridgeview challenged the findings of negligence.

"With respect to Bridgeview, the appellate court acknowledged that one generally has no duty to control the conduct of another to prevent him harming a third party, but concluded that a 'special

relationship' existed in the case at bar which imposed an affirmative duty upon Bridgeview to control the actions of George Loy, Sr., and George Loy, Jr. The appellate court reasoned that Bridgeview, through the person of Ted Loy, stood in a master-servant relationship with George Loy, Sr., and George Loy, Jr., and that Bridgeview had an affirmative duty, in accordance with section 317 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 317 (1965)), to control the conduct of the assistant coaches to prevent them from intentionally harming John Hills." *Hills*, 195 Ill. 2d at 226-27.

"The appellate court concluded that this duty arose 'once the beatings began and two one-minute lulls followed.' " *Hills*, 195 Ill. 2d at 227. "The court also determined that there was sufficient evidence to show that Bridgeview, acting through Ted Loy, had breached its duty to control its servants and that this breach of duty was a proximate cause of plaintiffs' injuries." *Hills*, 195 Ill. 2d at 227. The appellate court affirmed the trial court's decision.

The *Hills* court reversed the lower courts and stated:

> "Plaintiffs point out that, under the Restatement, 'one who volunteers services without an agreement for an expectation of reward may be a servant of the one accepting such services.' Restatement (Second) of Agency § 225 (1958). Plaintiffs contend that the volunteer status of the assistant coaches should not affect the resolution of this case. However, plaintiffs have not explained, under the facts of this case, what effective means of control Ted Loy could have utilized, in his capacity as master, to constrain the volunteer assistant coaches once the attack began. In the absence of any evidence of an effective means of control available to Ted Loy and, therefore, to Bridgeview, it would be 'tantamount to imposing strict liability' (*Estates of Morgan v. Family Counseling Center*, 77 Ohio 284, 298, 673 N.E.2d 1311, 1323 (1997)) to require Bridgeview to control the conduct of the volunteer assistant coaches. We decline to impose that standard of liability upon Bridgeview." *Hills*, 195 Ill. 2d at 241.

■ "Although the terms 'principal' and 'agent,' 'master' and 'servant,' 'employer' and 'employee' may have separate connotations for purposes of contract authority, such distinctions are immaterial for tort purposes. In order for a plaintiff to invoke the doctrine of *respondeat superior*, it is sufficient that one of the above relationships be established and that the wrongdoer be either the employee, the agent, or the servant. (1 J. Lee & B. Lindahl, Modern Tort Law § 7.02 (rev. ed. 1988); see also *Dean v. Ketter* (1946), 328 Ill. App. 206 (although words 'agent' and 'servant' are not wholly synonymous, there is no basic distinction between liability of principal for tort of agent and liability of master for tort of servant).) Incidentally, in some works, the

74

terms 'employer' and 'employee' and 'master' and 'servant' are used interchangeably. See, *e.g.*, 30 C.J.S. *Employer-Employee* § 3 (1992)." *Moy v. County of Cook*, 159 Ill. 2d 519, 523-24 (1994).

■ "When an action is brought against a master based on allegedly negligent acts of the servant and no independent wrong is charged on behalf of the master, liability is entirely derivative, being founded upon the doctrine of *respondeat superior*. (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 533.) '[T]o impute the negligence of one person to another, such persons must stand in a relation of privity and there is no such thing as imputable negligence except in those cases where such a privity as master and servant or principal and agent exists.' (*Palmer v. Miller* (1942), 380 Ill. 256, 259-60.) The master's liability is merely by reason of the contractual relationship. (*Palmer*, 380 Ill. at 259; see also W. Keeton, Prosser & Keeton on Torts § 69 (5th ed. 1984).) Absent an employment relationship, the doctrine does not apply. See *Palmer*, 380 Ill. at 259-60 (holding that minor cannot establish relationship of master and servant and so cannot be held liable under doctrine of *respondeat superior*); see also *Raglin v. HMO Illinois, Inc.* (1992), 230 Ill. App. 3d 642, 647." *Moy*, 159 Ill. 2d at 524.

The appellants argue that a master-servant relationship existed between Baum and Ronald McDonald House when the accident occurred. They further assert that, at the time of the accident, Baum was acting as an agent of Ronald McDonald House.

Initially, the appellants point out that attendance at camp events scheduled from June 6, 1997, to June 8, 1997, was mandatory for camp leaders. The appellants note that attendance at the Friday night meeting was mandatory for camp leaders and that accommodations were provided to camp leaders so that they would be present to greet counselors the following Saturday morning. Consequently, the appellants argue that the weekend as a whole was a mandatory working weekend for the camp leaders.

The appellants also contend that Ronald McDonald House had the right to control Baum's physical conduct at the time of the accident. The appellants remind this court that Dr. Baum testified that it was his belief that he could prohibit camp leaders from drinking alcohol during the time period after the Friday night meeting adjourned and before the subsequent meeting the following Saturday morning commenced.

The appellants maintain that when the accident occurred, Baum was performing a duty that was within the scope of the master-servant relationship that he held with Ronald McDonald House. It is the appellants' assertion that Baum was acting within the scope of the

master-servant relationship because he was transporting two camp leaders back to the camp from a place where they had been conducting camp business.

Consequently, the appellants argue that Ronald McDonald House is vicariously liable under the doctrine of *respondeat superior*. At the very least, the appellants contend the determination of whether there existed an agency relationship between Baum and Ronald McDonald House is a question of fact that should be determined by the jury. We disagree.

In *Anderson v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440 (1992), a 14-month-old minor was injured when she was struck as Daniel Searle backed his car out of his driveway at a residence in Hanover Park, Illinois. The plaintiffs, the minor's parents, alleged that Searle was acting as a leader for a Cub Scout Pack formed by the Greenbrook Parent Teacher Association (GPTA) and chartered by the Boy Scouts of America (BSA) through the Du Page Area Council of the Boy Scouts of America (Du Page Area Council) at the time of the accident. In particular, the plaintiffs alleged that immediately prior to the accident, Searle had delivered craft materials, which were to be used for a scouting project at the residence in question. Based on these facts, the plaintiffs sought to hold GPTA and BSA vicariously liable on the theory of *respondeat superior*. *Anderson*, 226 Ill. App. 3d at 441-42. The issue raised on appeal was whether a sufficient factual issue existed on the question of Searle's agency relationship with the defendant organizations to have precluded a judgment as a matter of law. *Anderson*, 226 Ill. App. 3d at 442.

As to the BSA, the court found that there were no provisions in the charter, bylaws, rules and regulations promulgated by the BSA that specifically granted BSA or its district councils direct supervisory powers over the method or manner in which adult volunteer scout leaders accomplish their tasks. The court further found that it did not appear that volunteer scouting leaders had the power to affect the legal relations of BSA or its district councils. As such, the court found that the plaintiffs had failed to establish that an agency relationship existed between Searle and Du Page Area Council or the BSA. *Anderson*, 226 Ill. App. 3d at 444-45.

The court also found that there was no evidence that the BSA or Du Page Area Council exercised any control over Searle on the date in question. The court determined that there was no evidence that Searle was acting within the scope of his authority as a pack leader when he operated his car, that he was asked to make the delivery of craft materials by anyone affiliated with the Boy Scouts or that he was directed by anyone within the scouting organization with regard to his

conduct in the performance of his duties. The court found that there was no evidence that driving was a requirement for adult scouting leaders or that the BSA, or any of its district councils, inquired into or checked any adult leader's driving capability. The court found that Searle's decision to deliver the materials by car was a gratuitous gesture and not a scouting activity. *Anderson*, 226 Ill. App. 3d at 445.

In *Giannoble v. P&M Heating & Air Conditioning, Inc.*, 233 Ill. App. 3d 1051 (1992), the plaintiff, as special administrator of the estate of the deceased, filed a two-count complaint for wrongful death based upon a car accident in which a van owned by defendant P&M Heating and Air Conditioning, Inc. (P&M), and driven by defendant William Smith collided with the deceased's vehicle. Count II of the complaint sought to recover under a theory of *respondeat superior*. The trial court granted the defendants' motion for summary judgment finding that Smith was not acting within the scope of his employment at the time of the accident.

P&M hired Smith as a heating, air conditioning, refrigeration and ventilation service technician. Smith was provided with a service van, which contained the tools he needed to perform his duties. Smith was allowed to take the van home in the evenings. *Giannoble*, 233 Ill. App. 3d at 1054.

On the day of the incident, Smith started work at 8 a.m. and finished at 4 p.m. He drove the company van directly home after completing work. At home, Smith received a call from a family member who needed help with her air conditioning unit. Smith agreed to look at her unit and make the needed repairs as a favor. Smith did not tell anyone at work about this. No customer receipt or other customary paperwork was generated for this job as well. *Giannoble*, 233 Ill. App. 3d at 1054-55.

Smith took the company van to do the repairs. Smith did not charge a fee for the repairs he made. After Smith completed the work, he used the pool that was at the family member's home. Smith brought swim clothes so that he in fact could go swimming. Afterwards, while Smith was driving home, he had an accident with the decedent. The *Giannoble* court found that on the facts presented, Smith was not acting within the scope of his employment for P&M at the time of the accident. *Giannoble*, 233 Ill. App. 3d at 1059.

The *Giannoble* court found that Smith was performing conduct of the kind P&M employed him to perform; however, the conduct did not occur substantially within authorized time and space limits nor was it actuated in any way by a purpose to serve his master. *Giannoble*, 233 Ill. App. 3d at 1062. The accident occurred well after his workday was complete and during his trip home from an errand that was actuated

by his own purposes. The court noted that Smith never would have made the trip had his family member not called him. The court found that this was a clear sign that Smith did not make the trip for the purposes of serving his master. *Giannoble*, 233 Ill. App. 3d at 1062-63.

■ In this matter, the trial court's decision to grant summary judgment was proper. It is undisputed that Baum was a volunteer camp leader for Ronald McDonald House. It is true that, as a volunteer camp leader, Baum had a master-servant relationship with Ronald McDonald House. However, Baum was not acting within the course and scope of his volunteer relationship with Ronald McDonald House when the accident occurred.

At the conclusion of the mandatory Friday night meeting, all official camp business ended until the following morning. As such, when the Friday night meeting concluded, all camp leaders were on their own free time. There was no policy that prohibited camp leaders from leaving the camp premises after the Friday night meeting concluded. Although Dr. Baum stated that he believed he could prohibit camp leaders from drinking after the Friday night meeting, he admitted that there were no written rules or prohibitions that prevented the campers from doing so. Thus, after the meeting, Baum was free to go wherever he pleased. Baum was only required to return to the camp the following morning to attend the mandatory two-day orientation weekend.

Some camp leaders, but not all, decided to go to the Keg Room on their own volition. Baum drove to and from the Keg Room in his own leased car. At the Keg Room, Baum, who was not working on camp business, drank beer and watched a basketball game on television. It is true that Delanty brought materials with her and indeed worked on camp business while she was at the Keg Room. However, this fact is immaterial. The relevant question that must be answered is whether Baum was acting as an agent of Ronald McDonald House when the accident occurred.

Baum went to the Keg Room to socialize. He did not go with the intent that his trip benefit Ronald McDonald House. The gathering at the Keg Room was not an extension of the Friday night meeting. Attendance at the Keg Room after the Friday night meeting was not mandatory. A number of camp leaders did not go to the Keg Room after the meeting. Moreover, there is no evidence that anyone from the Ronald McDonald House directed Baum to attend the Keg Room.

The accident did not occur within a time or place where Baum would reasonably be performing his duties as a volunteer camp leader. The Keg Room was not located on the camp's premises and was not a place in which Ronald McDonald House would reasonably expect Baum

to conduct his duties as a camp leader. Also, the accident, which happened shortly after midnight, occurred at a time when no official camp business was taking place.

When Baum departed from the Keg Room and attempted to drive the appellants back to the camp, he did not reenter the scope of his employment with Ronald McDonald House. Baum attended the Friday night meeting. Thereafter, he went to the Keg Room, where he drank and socialized for approximately two hours. Baum then attempted to drive himself and two other people back to the camp in a vehicle that was only intended to transport two people. Such conduct was not reasonable and was not authorized by Ronald McDonald House. This behavior was not incidental to any conduct that Ronald McDonald House authorized Baum to perform as a camp leader.

Baum's act of stopping at the Keg Room and drinking for two hours severed any connection to Ronald McDonald House. There is no evidence that anyone from Ronald McDonald House directed Baum to drive Berger and Delanty back to the camp. As in *Giannoble* and *Anderson*, Baum's act of driving Delanty and Berger was gratuitous in nature and not within the scope of his employment.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

QUINN and HARTIGAN, JJ., concur.