# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *Bowyer v. Adono*, 2020 IL App (3d) 180685

</div>

| | |
|---|---|
| Appellate Court Caption | SAMANTHA JO BOWYER, as Mother and Next Friend of John Paul Eskra Jr. and as Special Administrator of the Estate of John Eskra Sr., Deceased, Plaintiff-Appellant, v. MARIA ADONO, RAMON ADONO, and EFRAIN FERRERIA, Defendants (Maria Adono and Ramon Adono, Defendants-Appellees). |
| District & No. | Third District<br>No. 3-18-0685 |
| Filed | July 8, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 13-L-125; the Hon. Adrienne W. Albrecht, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John S. Eliasik, of Chicago, for appellant.<br><br>Jason Callicoat, of Querrey & Harrow, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Holdridge and Schmidt concurred in the judgment and opinion. |

## OPINION

¶ 1        Plaintiff—Samantha Jo Bowyer, as mother and next friend of John Paul Eskra Jr. and as special administrator of the estate of John Eskra Sr.—filed a wrongful death and survivor action against defendants—Maria Adono, Ramon Adono, and Efrain Ferreria—arising out of an automobile accident in which John Eskra Sr. was killed. In her fourth and fifth amended complaints, plaintiff alleged claims in which liability was based upon theories of *respondeat superior* and in-concert liability. Defendants, Maria and Ramon Adono (collectively referred to herein at times as defendants), filed motions for summary judgment on those claims.[1] After hearings, the trial court granted the motions. Plaintiff appeals. We affirm the trial court's judgment.

¶ 2                                              I. BACKGROUND
¶ 3        On October 12, 2012, at about 10:30 p.m., plaintiff's decedent, John Eskra Sr., was involved in an automobile accident with Efrain Ferreria on Illinois Route 114 in Momence, Kankakee County, Illinois. The accident occurred as Ferreria was pulling out of or had just left the property of defendants, Maria and Ramon Adono. Ferreria was intoxicated at the time. Eskra Sr. was injured in the crash and subsequently died of his injuries.

¶ 4        About a year later, in October 2013, plaintiff, acting in the capacities listed above, filed a civil lawsuit against defendants and Ferreria, alleging wrongful death and survivor claims.[2] The complaint was amended several times throughout the trial court proceedings. Of relevance to this appeal, in her fourth amended complaint, some of plaintiff's claims of liability against defendants were based upon a theory of *respondeat superior*, wherein plaintiff alleged that defendants were liable for the negligence of Ferreria because Ferreria was acting as an agent of defendants at the time of the accident.[3] Later filings by the parties indicated that plaintiff's claim was that Ferreria was an employee of defendants and was acting in the course and scope of his employment while at defendants' property that evening and at the time the accident occurred.

¶ 5        Defendants filed a motion for summary judgment on plaintiff's entire fourth amended complaint, including those claims where liability was based upon a theory of *respondeat superior*. Plaintiff filed a response to the motion, and defendants filed a reply to plaintiff's response such that the matter was fully briefed in the trial court prior to a hearing on the motion. Attached to the parties' filings were several supporting documents.

¶ 6        In April 2018, the trial court held a hearing on defendants' motion for summary judgment on plaintiff's fourth amended complaint. At the time of the hearing, the trial court had before it the parties' briefs and numerous supporting documents, including the depositions of Ramon and Maria Adono, Fernando Almanza, Efrain Ferreria, Isidro Lopez, and Illinois State Police

---

[1]Plaintiff obtained a default judgment against Ferreria. Ferreria is not involved in this appeal.

[2]Although Ferreria is a defendant in this action, we will refer to him separately from the other two defendants for the ease of the reader and because Ferreria is not involved in this appeal.

[3]In the later complaints, a second plaintiff was added. In those complaints, the plaintiffs were listed as Samantha Jo Bowyer, as mother and next friend of John Paul Eskra Jr., and Margarett Pryor, as special administrator of the estate of John Eskra Sr., deceased. For the purpose of simplicity and the convenience of the reader, we will continue to refer to plaintiff in the singular form here.

Trooper Chad Pardee. The evidence contained in those supporting documents can be summarized as follows.

¶ 7 Ramon testified in his deposition that he and Maria owned the subject property and had lived at that location for the past eight years with their 12-year-old son, S.A. Defendants had three other adult children who did not reside at the property. The property consisted of five acres, which included defendants' home, a large yard, two garages, and two horse barns for the seven pet horses that Ramon owned. Ramon called the property "Rancho El Jaral," which was the name of a ranch in Mexico where Ramon used to live. Ramon and Maria's property, however, was not an actual working ranch, and no income was derived from the property or the horses. Ramon was responsible for caring for the horses, and sometimes he had help doing so from his sons and friends. In his spare time, Ramon trained the horses to perform a kind of traditional Mexican "horse dancing."

¶ 8 From 2006 through the date of the accident, Ramon worked full time at Countryside Industries in Wauconda, Illinois. He was paid about $23 per hour. Ramon had no other employment and did not own any type of business or company.

¶ 9 Ramon had been friends/acquaintances with Fernando Almanza for about five years as of the date of the accident. Almanza was a supervisor at H&E Sod Farm. Isidro Lopez and Efrain Ferreria also worked at the sod farm and were supervised by Almanza. In addition to working at the sod farm, Almanza and Ferreria lived at the sod farm as well. Ramon knew Ferreria through Almanza. According to Ramon, Ferreria had only been to the ranch (Ramon and Maria's property) about four times prior to the accident and was always with other people when he was at the ranch. Ferreria had never been inside defendants' home.

¶ 10 On the day of the accident, Ramon got home from work around 6:30 p.m. Maria and S.A. were already home at that time. Ramon noticed when he got home that Maria had picked up a load of feed grain for the horses in Ramon's personal truck. As Ramon began to unload the grain, some of the men from the sod farm started showing up at the ranch unexpectedly. Almanza was the first to arrive. Lopez arrived a short time later. After Lopez, Ferreria arrived at the property in his own vehicle, along with Celso Rosales, an acquaintance of Ferreria. According to Ramon, he did not invite anyone over to his home that evening—all of the men showed up to the property unexpectedly. Ramon also did not ask any of the men for help unloading the grain; the men simply saw what he was doing and volunteered to help. Ramon did not compensate or pay money to any of the men for helping.

¶ 11 After the work was finished, all of the men went into a storage garage and talked and drank beer for the next two hours. Ramon had purchased the beer about a week earlier because it was on sale and had placed the beer in a cooler in the garage. Ramon and Almanza drank and talked in one part of the garage while the other three men drank together in another part of the garage. Ramon may have seen Ferreria with one beer but did not know how much alcohol Ferreria had drank that evening. According to Ramon, Ferreria did not appear to be intoxicated, did not have difficulty walking or talking, did not appear to present any danger in operating his vehicle, and did not require assistance in getting in or operating his vehicle. Ramon did not encourage Ferreria to operate the vehicle and did not assist Ferreria in doing so.

¶ 12 At about 9 p.m., the men started leaving defendants' property to go home. Almanza left the ranch first, and Lopez left about 15 minutes later. Shortly after Lopez left, at about 10 p.m., Ramon was walking to his house when he saw Ferreria and Rosales traveling down the driveway in Ferreria's vehicle to leave the property. Ramon's family was already inside the

house at that time. As Ramon was walking inside, he heard a collision noise from the road. Ramon went out front and saw that Ferreria's vehicle and the decedent's vehicle had collided in the middle of Route 114 in front of Ramon and Maria's property. Both of the vehicles were entirely on Route 114 at that time and were not on defendants' property. Ramon did not tell the police at the scene that Rosales had been in Ferreria's vehicle at the time of the accident but had fled and did not identify Rosales as a witness in his later response to plaintiff's interrogatories.

¶ 13    Ramon's wife, Maria, testified in her deposition that on the date of the accident, she worked full time at Flanders Corporation in Momence and earned $8.25 per hour. Maria confirmed that she had no other employment at the time, that defendants did not own any business, that defendants did not derive any income from the pet horses at their home, and that defendants did not hire Ferreria for any purpose or pay Ferreria any type of compensation. Maria agreed that Ramon was responsible for caring for the horses and that sometimes defendants' sons or Ramon's friends would help him. In the hours leading up to the accident, Maria was in the house cooking and doing laundry. Maria did not know if any of Ramon's friends had come over that evening or what was being done outside. Maria only went outside for a short period to see what had happened after she had heard the sound of the collision. When Maria went outside, she could tell that the two vehicles involved in the collision were entirely on Route 114 and were not on defendants' property. Maria had seen some of Ramon's friends at the ranch on a couple of occasions in the past, helping Ramon empty the grain for the horses, but did not know if Ferreria had ever been to the ranch before. According to Maria, Ramon could not unload the grain by himself, and it was normal for someone else—either Ramon's sons or his friends—to be at the property helping Ramon when the grain was brought to the property once every three to four weeks. On the day of the accident, Maria did not invite Ferreria over to her home and did not ask Ferreria for help with the horses. Furthermore, at no time did Maria assist or control Ferreria or his vehicle.

¶ 14    Fernando Almanza testified that he had worked as a supervisor at the sod farm for the past 14 years (as of the time of the deposition in 2016) and had lived at a house that was located on the sod farm property. Ferreria and Lopez worked at the sod farm under Almanza's supervision and also lived at the sod farm as well. As of the date of the deposition, Almanza had been friends/acquaintances with Ramon for about five years. Prior to the accident, Almanza had stopped by defendants' property on about five occasions to socialize with Ramon. Lopez and Ferreria also knew Ramon. On prior instances when Ramon had gotten a load of grain in at the house, he called Lopez and Ferreria to help him unload the grain. Almanza did not know if Lopez and Ferreria helped Ramon out of friendship or whether they got paid. According to Almanza, Lopez and Ferreria would go to the ranch three to four times a week to see Ramon after they got off of work at the sod farm. Sometimes Lopez and Ferreria would help Ramon unload the grain; at other times, they would help Ramon clean out the stables. Rosales also helped Ramon in the past with the horses.

¶ 15    On the day of the accident, Almanza arrived at defendants' property around 5:30 p.m. Almanza had not spoken to Ramon previously that day and had stopped by defendants' property on his way back from Momence. Almanza did not know that other people would be stopping by Ramon's house that day/evening and did not know that Ramon was planning to get a truckload of grain for his horses that day. While Almanza was at the ranch, Lopez and Ferreria were also present, although Almanza did not remember whether Lopez and Ferreria

- 4 -

had arrived at the ranch before or after he had arrived. Rosales was also present at the ranch as well.

¶ 16    While Almanza was at the ranch that evening, he and Ramon were standing toward the front of the property talking and drinking beer. The other three men—Lopez, Ferreria, and Rosales—were back in the stable area of the property. At one point, Almanza saw Ferreria in the stable helping Ramon's grandson ride a horse. Almanza saw that Lopez and Rosales were drinking beer that evening but did not know whether Ferreria was drinking as well. The beer was already at the property and was located in a cooler. Each person that Almanza saw drinking had about three beers. When it started getting dark, Almanza left the ranch and went back to his home at the sod farm. He was the first person to leave the property that evening and left before the collision occurred. Ramon called Almanza later that night and told him that Ferreria had been involved in an accident "coming out of *** Ramon's house."

¶ 17    Efrain Ferreria testified in his deposition that he had worked as a laborer at the sod farm and had lived at that location since 1988. Ferreria met and became friends with Ramon in 2010 when Ramon worked at Countryside Industries. Ferreria also knew Ramon's wife, Maria. Ramon and Maria kept horses at the ranch that they trained to do traditional Mexican horse dancing. Doing so was a hobby for defendants, not a business. Prior to the accident, Ferreria had been to defendants' ranch on numerous occasions and would go to defendants' ranch on a regular basis—about once every two weeks—to help with the horses. According to Ferreria, however, during that entire time period, his only employer was the sod farm. Ferreria was not employed by, or working for, Ramon or Maria and had never used his vehicle to carry property for defendants.

¶ 18    On the date of the accident, Ferreria worked at the sod farm from 6 a.m. to 6 p.m. When he got off work, although his driver's license was revoked, Ferreria drove his personal vehicle to downtown Momence to get dinner. After dinner, Ferreria stopped by defendants' ranch because he knew that some of his coworkers, Almanza and Lopez, were going to go to the ranch that evening to help unload some grain. According to Ferreria, defendants did not ask or tell him to come to the ranch and were not expecting him to come to the property that evening. Rather, Ferreria voluntarily decided to go to the ranch to visit with his friends and coworkers. Ferreria stated in his testimony that he was not obligated to stay at the ranch and that he was free to leave the ranch whenever he wanted. Ferreria's testimony as to why he went to the ranch that evening, however, was somewhat inconsistent as Ferreria also testified that the only reason he went to the ranch was to help unload the grain.

¶ 19    Ferreria arrived at defendants' ranch at about 7 p.m. At that time, Almanza, Lopez, and Rosales were already at defendants' property, along with some of Ramon's family. Ramon's family stayed in the house most of the evening and did not witness the accident that later occurred. After arriving at the property, Ferreria saw that Almanza, Lopez, and Rosales were socializing and were helping Ramon unload some grain from Ramon's truck, so Ferreria voluntarily offered to help as well without being asked to do so. Ferreria, Lopez, and Rosales emptied the grain, put it into barrels, and placed the barrels into a storage area that was part of the stables. Almanza did not help but was supervising the work. The work took about an hour to an hour and a half to complete. According to Ferreria, helping Ramon that evening was purely voluntary, and neither he nor the others were paid in any way for their help.

¶ 20    After the work was finished, Ferreria took defendants' grandson around on a pony while the others drank beer, which Ferreria believed came from Ramon. When Ferreria was done

- 5 -

with the pony ride, he sat in the garage area with the others talking, listening to music, and drinking beer. Ferreria helped himself to the beer, which was contained in a cooler in the garage. In total, he drank about 6-7 beers that evening while he was at defendants' property.

¶ 21    At about 8 p.m. or some time thereafter, Almanza left defendants' property for the evening. An hour or two later, at about 10 p.m., Lopez, Ferreria, and Rosales decided to leave as well. Lopez left in his own vehicle, immediately followed by Ferreria and Rosales. Ferreria and Rosales left together in Ferreria's vehicle with Ferreria driving. Defendants' driveway abutted Route 114, which, in that area, was a two-lane road, with one lane running in each direction. When Ferreria got to the end of defendants' driveway, he and Rosales both looked to make sure there was no oncoming traffic. Not seeing any other vehicles, Ferreria turned left onto Route 114 to go back to his home at the sod farm. Shortly after Ferreria pulled completely out of the driveway and onto Route 114, the front driver's side of his vehicle was struck by another vehicle. Ferreria did not see the other vehicle prior to the impact. After the collision occurred, Ferreria fainted or lost consciousness, although he remembered Rosales leaving the scene of the accident before the police arrived. The next thing that Ferreria knew or remembered was that he was being handcuffed by the police. Ferreria did not tell the police that Rosales was present in the vehicle when the accident had occurred.

¶ 22    According to Ferreria, at no time that evening did he feel drunk or intoxicated or exhibit signs of drunkenness or intoxication. Ferreria also did not show any sign that he was unable to operate his vehicle—although defendants were supposedly aware that Ferreria's driver's license was revoked (according to Ferreria's testimony)—and he drove his vehicle in the same manner that he had on all prior occasions. In Ferreria's opinion, neither he nor anyone present would have thought that he was intoxicated or unable to operate his vehicle that evening.

¶ 23    As a result of the accident in the present case, Ferreria was charged with driving under the influence (DUI). He pled guilty and served seven months in jail. According to Ferreria, the accident in the instant case was the third time he was charged with DUI. The first DUI offense occurred in 2004. Ferreria pled guilty to that offense, was placed on court supervision, and had his driver's license suspended for six months. Ferreria's second DUI offense was in 2009. Ferreria pled guilty to that offense and had his driver's license revoked for three years. The revocation was later extended based upon the current offense.

¶ 24    Isidro Lopez testified in his deposition that he had lived and worked at the sod farm for the past 22 years and that Almanza was his supervisor at the sod farm. Lopez knew Ramon and would go to defendants' ranch about once a week to help feed and clean the horses. Doing so was side work for Lopez and had nothing to do with Lopez's job at the sod farm. Lopez did not get paid for helping at the ranch and did so for friendship reasons. The only time when Lopez would go to defendants' ranch was when he was helping with the horses. According to Lopez, Ferreria went to the ranch "[o]nce in a while" to help with the horses as well. Lopez denied that Almanza would get people from the sod farm to help Ramon with the horses. On the day of the accident, Lopez, Ferreria, Almanza, and Rosales were all present at the ranch, along with Ramon. Lopez left that night before the accident occurred and did not see the collision. Ramon called Lopez later than evening and told him that Ferreria was involved in a car accident on the road outside his ranch.

¶ 25    Illinois State Police Trooper Chad Pardee testified that he was dispatched to the scene of the accident shortly after the accident occurred. Upon his arrival, Pardee saw that both of the vehicles involved in the crash were located on Route 114 and were not on defendants' property.

Pardee asked Ferreria what had happened. Ferreria told Pardee that he was pulling out of defendants' driveway and did not see any cars coming and was struck by another vehicle. Chemical tests, which were conducted later, showed that Ferreria's blood alcohol level was over the legal limit and that Ferreria had drugs in his system.

¶ 26 Pardee subsequently interviewed Ferreria in more detail at the jail. Ferreria told Pardee that prior to the accident, he was at defendants' property feeding their horses and loading grain. Ferreria did not state that he was at defendants' property for a social visit. Ferreria admitted that he had been drinking alcohol that evening and told Pardee that he had drank two or three beers. Pardee did not find that statement to be truthful due to Ferreria's blood alcohol level. Ferreria also told Pardee that the accident occurred as he was pulling out of defendants' driveway onto Route 114. Ferreria did not tell Pardee that Rosales was a passenger in Ferreria's vehicle at the time of impact. According to Pardee, the failure to identify a witness in a fatal crash was a crime.

¶ 27 At the conclusion of the hearing, the trial court granted summary judgment for defendants on plaintiff's fourth amended complaint. However, the trial court granted plaintiff leave to file a fifth amended complaint to allege claims against Ramon where liability was based upon a theory of in-concert liability (that Ramon was liable for the decedent's death because Ramon assisted and encouraged Ferreria in becoming intoxicated and in driving his vehicle in an impaired state). Ramon filed a motion for summary judgment on the fifth amended complaint, plaintiff filed a response, and Ramon filed a reply to plaintiff's response. Attached to the parties' filings as supporting documents were many of the same depositions that had been submitted in the proceedings on the prior motion for summary judgment.

¶ 28 In October 2018, the trial court held a hearing on Ramon's motion. After listening to the arguments of the attorneys, the trial court took its decision under advisement. The following month, the trial court issued a written order granting summary judgment for Ramon on the fifth amended complaint. Plaintiff appealed.

¶ 29 II. ANALYSIS

¶ 30 On appeal, plaintiff argues that the trial court erred in (1) granting summary judgment for defendants, Ramon and Maria, on those claims in plaintiff's fourth amended complaint where liability was based upon a theory of *respondeat superior*, and (2) granting summary judgment for defendant, Ramon, on those claims in plaintiff's fifth amended complaint where liability was based upon a theory of in-concert liability. We will address each of those arguments separately in the analysis that follows.

¶ 31 A. Standard of Review and Applicable
Legal Principles on Summary Judgment

¶ 32 The purpose of summary judgment is not to try a question of fact but to determine if one exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions on file, and affidavits, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. See 735 ILCS 5/2-1005(c) (West 2018); *Adams*, 211 Ill. 2d at 43. Summary judgment should not be granted if the material facts are in dispute or if the material facts are

not in dispute but reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt. *Id.* In appeals from summary judgment rulings, the standard of review is *de novo*. *Id.* When *de novo* review applies, the appellate court performs the same analysis that the trial court would perform. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43. A trial court's grant of summary judgment may be affirmed on any basis supported by the record. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 33                                  B. Plaintiff's Claims Where Liability
                             Was Based Upon a Theory of *Respondeat Superior*

¶ 34        As noted above, plaintiff argues first on appeal that the trial court erred in granting summary judgment for defendants, Ramon and Maria, on those claims in plaintiff's fourth amended complaint where liability was based upon a theory of *respondeat superior*. Plaintiff asserts that summary judgment should not have been granted for defendants on those claims because the evidence presented in the first summary judgment proceeding showed that, at all relevant times leading up to and including the point of the collision, Ferreria was an employee or agent of defendants and that Ferreria was acting in the course and scope of that employment (or that a genuine issue of material fact exists as to that matter). In making that assertion, plaintiff maintains that for an employment or agency relationship to exist between defendants and Ferreria, defendants were not required to operate the ranch as a business or to pay Ferreria compensation for his work. For those reasons, plaintiff contends that defendants were vicariously liable for the tortious acts of Ferreria under the doctrine of *respondeat superior*. Plaintiff asks, therefore, that we reverse the trial court's ruling granting summary judgment for defendants, Ramon and Maria, on those claims in plaintiff's fourth amended complaint where liability was based upon a theory of *respondeat superior* and that we remand this case for further proceedings on those claims.

¶ 35        Defendants argue that the trial court's ruling was proper and should be upheld. Defendants assert that summary judgment was correctly granted in their favor on the claims in plaintiff's fourth amended complaint where liability was based upon a theory of *respondeat superior* because the evidence presented in the first summary judgment proceeding showed that at the time of the accident (1) Ferreria was not employed by or under the control of defendants, (2) defendants were not in, or in control of, Ferreria's vehicle, (3) there was no agency relationship between defendants and Ferreria, and (4) Ferreria was not acting within the scope of the alleged agency relationship. For those reasons, defendants contend that they were not vicariously liable for Ferreria's negligent acts under a theory of *respondent superior*. Defendants ask, therefore, that we affirm the trial court's ruling granting summary judgment for defendants on those claims in plaintiff's fourth amended complaint where liability was based upon that theory.

¶ 36        It is a well settled rule in Illinois that liability for damages caused by a negligent driver does not attach against another person, other than the driver, unless that other person owns the vehicle or has the right to control the vehicle. See, *e.g.*, *Anderson v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440, 444 (1992). Similarly, as a general rule, a person who is injured by the negligence of another must seek his remedy from the individual who caused the injury.

*Adames v. Sheahan*, 233 Ill. 2d 276, 298 (2009); *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1056-57 (2011). An exception to that general rule, however, may apply in the context of a principal-agent relationship (agency relationship). See *Adames*, 233 Ill. 2d at 298; *Sperl*, 408 Ill. App. 3d at 1057. Under the doctrine of *respondeat superior*, a principal may be held vicariously liable for the negligent actions of an agent that caused a plaintiff's injury—even when the principal did not himself engage in any conduct in relation to the plaintiff—if the negligent acts were committed within the scope of the agency relationship. See *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 42; *Adames*, 233 Ill. 2d at 298; *Sperl*, 408 Ill. App. 3d at 1057; *Anderson*, 226 Ill. App. 3d at 443; *Krickl v. Girl Scouts, Illinois Crossroads Council, Inc.*, 402 Ill. App. 3d 1, 4-5 (2010).

¶ 37    The test for determining whether an agency relationship exists is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal. *Sperl*, 408 Ill. App. 3d at 1057; *Anderson*, 226 Ill. App. 3d at 443; see also Restatement (Second) of Agency §§ 2, 220 (1958) (setting forth the definition of a servant). The ability or right to control the work is a key element in the determination, regardless of whether the principal actually exercises the right to control. *Sperl*, 408 Ill. App. 3d at 1057; *Anderson*, 226 Ill. App. 3d at 443-44; see also Restatement (Second) of Agency §§ 2, 220 (1958). An agency relationship may exist even when the alleged agent is a volunteer. See *Alms v. Baum*, 343 Ill. App. 3d 67, 71 (2003); *Krickl*, 402 Ill. App. 3d at 5; Restatement (Second) of Agency § 225 (1958).

¶ 38    For cases with a factual situation like the present case, section 228 of the Restatement (Second) of Agency provides that the conduct of a servant is within the scope of employment if all three of the following criteria are satisfied: (1) the conduct was of the kind the servant was employed to perform; (2) the conduct occurred substantially within the authorized time and space limits; and (3) the conduct was motivated, at least in part, by a purpose to serve the master.[4] Restatement (Second) of Agency § 228 (1958); *Adames*, 233 Ill. 2d at 298; *Krickl*, 402 Ill. App. 3d at 8. In other words, the plaintiff must show that a contemporaneous relationship exists between the tortious act and the scope of employment. *Adames*, 233 Ill. 2d at 299; *Krickl*, 402 Ill. App. 3d at 8.

¶ 39    The party seeking to impose liability on the principal has the burden of proving the existence and scope of the alleged agency relationship. *Anderson*, 226 Ill. App. 3d at 444; *Krickl*, 402 Ill. App. 3d at 5. Although the resolution of those two issues (existence and scope) is usually a question of fact for the trier of fact to decide, it may be decided by the trial court as a question of law when the material facts relating to the relationship are undisputed and only one reasonable conclusion may be drawn from the undisputed facts or where no liability exists as a matter of law. See *Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196, 202 (2008) (applying that rule in determining whether an agency relationship existed); *Adames*, 233 Ill. 2d at 305-06 (applying that rule in determining the scope of an agency relationship); *Krickl*, 402 Ill. App. 3d at 5 (applying that rule, although somewhat implicitly, in determining both the existence and scope of an agency relationship).

¶ 40    In the instant case, after reviewing the pleadings and supporting documents presented in the first summary judgment proceeding, we find that the underlying material facts are not in

---

[4]Section 228 of the Restatement lists an additional fourth criterion that is not applicable here.

dispute and that only one reasonable conclusion can be drawn from those undisputed facts—that Ferreria was not an employee or agent of defendants at the time of the accident. The evidence presented in the summary judgment proceeding showed that defendants did not operate the ranch as a business, that defendants did not hire or ask Ferreria to help out at the ranch, that defendants did not ask Ferreria to stop by the ranch that evening, that defendants did not compensate Ferreria for helping out at the ranch, and that Ferreria was free to come and go as he chose to do so that evening. Thus, it is abundantly clear from the facts presented that neither Ramon nor Maria had any ability to control Ferreria, his work at the premises, or his vehicle. The only reasonable conclusion that can be reached from those facts, therefore, is that Ferreria was not an employee or agent of Ramon or Maria at the time of the accident. See *Sperl*, 408 Ill. App. 3d at 1057; *Anderson*, 226 Ill. App. 3d at 443-44. Although Almanza testified in his deposition that there was an employment relationship between defendants and Ferreria, it is the underlying facts of this case—and not the label that Almanza placed upon the relationship in his deposition—that is dispositive. *Cf. Sperl*, 408 Ill. App. 3d at 1057 (stating the rule that applies in the context of the labels placed upon the relationship in a written agreement).

¶ 41     Because the evidence showed that Ferreria was not an employee or agent of defendants, Ramon and Maria, defendants could not be held liable for Ferreria's negligent acts under a theory of liability based upon *respondeat superior*. See *Adames*, 233 Ill. 2d at 298; *Sperl*, 408 Ill. App. 3d at 1057. The trial court, therefore, properly granted summary judgment for defendants on the claims in plaintiff's fourth amended complaint where liability was based upon that theory.

¶ 42     We note, however, that even if we were to assume, for the sake of argument, that an agency relationship existed in this case between defendants and Ferreria, we would still have to uphold the trial court's grant of summary judgment in the first summary judgment proceeding because the only reasonable conclusion that can be drawn from the undisputed underlying material facts is that Ferreria was not acting within the scope of the alleged employment relationship when the accident occurred. The evidence presented in the first summary judgment proceeding showed that any alleged work that Ferreria was doing for defendants had long since been completed and that Ferreria had stayed on the property of his own accord to drink beer and to socialize with some of the other men. After doing so for an hour or two, Ferreria—again, of his own accord—decided to leave the property and drive home. There was no evidence presented to suggest that Ferreria's conduct in the last hour or two leading up to and including the accident was in any way motivated by a desire to serve defendants. Nor was Ferreria's conduct at that time of the type that Ferreria was allegedly hired to perform. Thus, the only reasonable conclusion that can be reached, based upon the evidence presented, was that Ferreria was not acting within the scope of his alleged employment when the accident occurred. See Restatement (Second) of Agency § 228 (1958); *Adames*, 233 Ill. 2d at 299; *Krickl*, 402 Ill. App. 3d at 8.

¶ 43                              C. Plaintiff's Claims Where Liability
                              Was Based Upon a Theory of In-Concert Liability

¶ 44     Plaintiff argues second on appeal that the trial court erred in granting summary judgment for defendant, Ramon, on those claims in plaintiff's fifth amended complaint where liability was based upon a theory of in-concert liability. Plaintiff asserts that summary judgment should

- 10 -

not have been granted for Ramon on those claims because the evidence presented in the second summary judgment proceeding showed that, in the hours leading up to the accident and just prior to the accident, Ramon encouraged and assisted Ferreria in becoming intoxicated to the point of impairment and in operating his vehicle in an impaired state. Thus, plaintiff contends that Ramon acted in-concert with Ferreria in causing the decedent's death and that Ramon is directly liable for the death of the decedent. Plaintiff asks, therefore, that we reverse the trial court's ruling granting summary judgment for defendant, Ramon, on those claims in plaintiff's fifth amended complaint where liability was based upon a theory of in-concert liability and that we remand this case for further proceedings on those claims.

¶ 45    Defendant, Ramon, argues that the trial court's ruling was proper and should be upheld. Ramon asserts that summary judgment was correctly granted in his favor on the claims in plaintiff's fifth amended complaint where liability was based upon a theory of in-concert liability because plaintiff failed to produce, and cannot produce, evidence in the summary judgment proceeding to establish that Ramon knew that Ferreria was intoxicated, that Ramon substantially assisted or encouraged Ferreria to become intoxicated to the point of impairment, or that Ramon substantially assisted or encouraged Ferreria to drive his vehicle in an impaired state. In making that assertion, Ramon points out that for in-concert liability to apply, a defendant must do more than merely fail to prevent another person's tortious conduct. For those reasons, Ramon contends that he was not directly liable for the decedent's death under a theory of in-concert liability. Ramon asks, therefore, that we affirm the trial court's ruling granting summary judgment for Ramon on those claims in plaintiff's fifth amended complaint where liability was based upon that theory.

¶ 46    Section 876 of the Restatement (Second) of Torts addresses in-concert liability. See Restatement (Second) of Torts § 876 (1979). Under section 876(b), which plaintiff relies upon here, a defendant is liable for the harm caused to a third party by another person's tortious conduct if the defendant (1) knew that the other person's conduct constituted a breach of duty and (2) gave substantial assistance or encouragement to the other person in conducting himself that way. See Restatement (Second) of Torts § 876(b) (1979); *Simmons v. Homatas*, 236 Ill. 2d 459, 476 (2010); *Norman v. Brandt*, 397 Ill. App. 3d 1074, 1080, 1082 (2010). In determining whether a defendant has provided substantial assistance or encouragement, the following five factors should be considered: (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) the defendant's presence or absence at the time of the tort, (4) the defendant's relation to the other person, and (5) the defendant's state of mind. Restatement (Second) of Torts § 876 (1979); *Simmons*, 236 Ill. 2d at 477-78. For liability to attach under section 876, the defendant's conduct must be more than benign or slight—the defendant must have actively participated in the other person's tortious conduct. *Rogers v. Reagan*, 355 Ill. App. 3d 527, 533 (2005). The question of whether a defendant's conduct constituted substantial assistance or encouragement for the purpose of section 876 liability is usually a question of fact for a jury to decide. See *Simmons*, 236 Ill. 2d at 477-78; *Sanke v. Bechina*, 216 Ill. App. 3d 962, 971-72 (1991). However, it may be decided by the trial court as a matter of law when the material facts are undisputed and only one conclusion may be drawn from those undisputed facts. *Cf. Ioerger*, 232 Ill. 2d at 202 (applying that same principle in determining whether an agency relationship existed); *Adames*, 233 Ill. 2d at 305-06 (applying that same principle in determining the scope of an agency relationship); *Krickl*, 402 Ill. App. 3d at 5 (applying that same principle, although somewhat implicitly, in

determining both the existence and scope of an agency relationship); see also *Norman*, 397 Ill. App. 3d at 1083-84 (affirming a trial court's grant of summary judgment where in-concert liability was at issue); *Rogers*, 355 Ill. App. 3d at 532-33 (same).

¶ 47 In the present case, after having reviewed the evidence presented at the second summary judgment proceeding and having considered the factors set forth above, we find that the underlying material facts are not in dispute and that only one reasonable conclusion can be drawn from those undisputed facts—that defendant, Ramon, did not know that Ferreria was impaired that evening and did not substantially assist or encourage Ferreria in becoming impaired or in operating his vehicle in an impaired state. First, as to knowledge, the evidence presented at the summary judgment proceeding showed that at the time Ferreria was drinking, Ramon was off in a different area talking to Almanza, that Ferreria was helping himself to beer from Ramon's cooler in the garage area, that Ramon did not know how much Ferreria had to drink, that Ferreria did not appear intoxicated or impaired, that Ferreria had no difficulty walking or talking, and that Ferreria did not need assistance in getting in or driving his vehicle. Second, as to encouragement, there is no evidence that Ramon encouraged Ferreria to become intoxicated, to operate his vehicle in an impaired state, or to leave the premises in his vehicle. To the contrary, the evidence showed that Ferreria decided on his own to leave the property at that time and to do so by driving his vehicle away from the property. Third, as to assistance, the evidence established that Ramon did not assist Ferreria in drinking alcohol, other than having some alcohol located in the garage; that Ramon did not assist Ferreria in getting to or in his vehicle; and that Ramon did not assist Ferreria in operating the vehicle that evening. Thus, based upon the evidence presented and the factors set forth above, we must conclude that plaintiff did not, and could not, present sufficient evidence in the summary judgment proceeding to establish that Ramon was liable for the decedent's death based upon a theory of in-concert liability. Therefore, we affirm the trial court's grant of summary judgment for Ramon on those claims in plaintiff's fifth amended complaint where liability was based upon that theory.

¶ 48                                    III. CONCLUSION
¶ 49 For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 50 Affirmed.