**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190103-U

Order filed July 1, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| SHAWN J. O'BRIEN, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellee, | ) | Kankakee County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| TERRY L. JENSEN, DAVID H. PETERS and | ) | |
| REITER FARM, INC., | ) | Appeal No. 3-19-0103 |
| | ) | Circuit No. 16-L-113 |
| Defendants | ) | |
| | ) | |
| (David H. Peters and Reiter Farm, Inc., | ) | Honorable |
| | ) | Adrienne W. Albrecht, |
| Defendants-Appellants). | ) | Judge, presiding. |

JUSTICE DAUGHERITY delivered the judgment of the court.
Presiding Justice McDade and Justice Schmidt concurred in the judgment.

**ORDER**

*HELD*: The trial court erred in denying Reiter Farm's motions for directed verdict and judgment notwithstanding the verdict because defendant Reiter Farm could not be vicariously liable for the negligent driving of codefendant Terry L. Jensen, as a matter of law, where plaintiff failed to present some evidence of an agency relationship between Jensen and Reiter Farm. The trial court did not err in denying defendant David H. Peters's motions for directed verdict and judgment notwithstanding the verdict where the evidence, viewed in its aspect most

favorable to plaintiff, indicated that Jensen was Peters's employee and was acting within his scope of employment at the time of the collision.

¶ 1  Plaintiff, Shawn J. O'Brien, filed a personal injury action against defendants, Terry L. Jensen, David H. Peters, and Reiter Farm, Inc. During the jury trial, plaintiff and defendants Peters and Reiter Farm all moved for a directed verdict in their favor on the issue of agency, which the trial court denied. Following deliberations, the jury found in favor of plaintiff and against all three defendants. The trial court entered a judgment of $142,390.12 against all defendants in accordance with the jury's assessment of damages. Peters and Reiter Farm filed a posttrial motion for judgment notwithstanding the verdict (judgment *n.o.v.*), or in the alternative, motion for a new trial, which the trial court denied. Peters and Reiter Farms appealed, arguing that trial court erred as a matter of law by denying their motions for directed verdict and for judgment *n.o.v.*, arguing the evidence showed that: (1) Jensen had never been an employee or agent of either Peters or Reiter Farm; and (2) Jensen was not acting within the scope of his alleged employment at the time of the collision. Peters and Reiter Farm also argued on appeal that the trial court erred in denying their motion for new trial because the jury's finding of their vicarious liability based upon a theory of *respondeat superior* was against the manifest weight of the evidence presented at trial. We affirm the trial court's judgment entered against Peters and reverse the trial court's judgment entered against Reiter Farm.

¶ 2          I. BACKGROUND

¶ 3  Following an incident where a tractor-trailer driven by Jensen collided with a vehicle driven by plaintiff, plaintiff filed a civil lawsuit against defendants. In his three-count complaint, plaintiff alleged that on October 19, 2014, in Manteno, Illinois, he was driving northbound on East Road near the intersection of North Road. Jensen was driving southbound on East Road and made a left turn at the intersection, colliding with plaintiff's vehicle. In Count I, plaintiff alleged

that defendant Jensen was negligent in the manner in which he operated the truck, and Jensen's negligence proximately caused injuries to plaintiff. In Count II, plaintiff alleged that defendant Peters owned the truck driven by Jensen, Jensen was an agent and/or employee of Peters at the time of the collision, and Jensen was acting within the scope of that agency and/or employment at the time of the collision. Plaintiff alleged that Peters, "by and through his agents and/or employees," was negligent in the manner the truck was operated, which proximately caused injuries to plaintiff. In Count III, plaintiff alleged that Jensen was an agent and/or employee of Reiter Farm at the time of the collision, and Jensen was acting within the scope of that agency and/or employment at the time of the collision. Plaintiff further alleged that Reiter Farm, "by and through its agents and/or employees," was negligent in the manner the truck was operated, which proximately caused injuries to plaintiff.

¶ 4    In his answer to the complaint, Jensen denied that he was negligent and that any of his alleged negligent acts proximately caused injury to plaintiff. In Peters and Reiter Farm's amended answer to the complaint, Peters admitted that he owned the Mack truck driven by Jensen at the time of the occurrence but denied that Jensen was his agent and/or employee and denied that Jensen was acting within the scope of any alleged agency and/or employment. Reiter Farm denied that Jensen operated the Mack truck with permission or within the scope of his employment and further denied that Jensen was an employee of Reiter Farm or that Reiter Farm owned the Mack truck. Both Peters and Reiter Farm denied that any agent or employee of either of them was involved in the said occurrence.

¶ 5    Following discovery by the parties, Peters and Reiter Farm filed a motion for summary judgment, arguing, among other things, that Jensen's job did not include driving the Mack truck on public roads so that Jensen was not acting within the scope of his employment at the time of

3

the occurrence. In response, plaintiff argued there were several questions of fact for the jury to resolve to preclude summary judgment as to whether Jensen was acting within the scope of his employment. The trial court denied the motion for summary judgment.

¶ 6                                          A. Jury Trial

¶ 7        A jury trial took place on October 15 through 18, 2018.

¶ 8                                    i. Testimony of Jensen

¶ 9        Jensen testified that on October 19, 2014, on the day of the collision, he was an employee of Reiter Farm and he worked for two men, Ron Reiter and Dave Peters. In October 2014, Jensen helped Reiter and Peters with their farming operations. Both Reiter and Peters paid Jensen at an hourly rate. Jensen typically helped Reiter and Peters during the planting season in the spring and the harvest season during the fall. During the fall harvest season and the spring planting season, Jensen reported to Reiter and Peters, who were Jensen's bosses. Jensen testified he "mainly did the maintenance."

¶ 10        Jensen testified that on October 19, 2014, Reiter picked up Jensen for work. Jensen did not have a valid driver's license. Jensen's workday started when he was picked up by Reiter and driven to Reiter Farm. Reiter Farm was the "essential hub" of the farming operation run by Reiter and Peters. Peters's home was located on Reiter Farm. All the trucks were kept at Reiter Farm, including the Mack truck at issue in this case. The Mack truck was used to transport harvested grain from the field to the grain elevator in town. Either Reiter or Peters owned the Mack truck.

¶ 11        When Peters worked in the field, his role was to run the combine. Jensen's role was to run the auger cart (a tractor that pulls a bin) alongside the combine to help collect the harvest.

4

When the auger cart became full, Jensen would load the full auger bin onto one of the trucks, which included the Mack truck. The loaded truck would then be taken to the grain elevator.

¶ 12    According to Jensen, the plan for the workday on October 19, 2014, was that Jensen was going to report to the farm, gather items that would be needed in the field, and go to the field to help with the harvesting. On a typical day, Reiter would drive Jensen out to the field in the Mack truck because the Mack truck was needed in the field. But on October 19, 2014, Reiter left after he arrived at Reiter Farm with Jensen, leaving Jensen as the only person at the farm. The keys to the Mack truck were usually kept inside the Mack truck.

¶ 13    Prior to October 19, 2014, Jensen had driven the Mack truck to "[j]ust to move it around in the yard or out in the field if it was in a bad spot to load." Jensen had never driven it on the road. He had only driven it at Reiter Farm and out in the field. Jensen testified that he did not have "express permission to drive that truck on the road." He only had permission to drive the Mack truck on the farm and in the field, if necessary, "but that didn't happen very often." Prior to October 19, 2014, Jensen had driven the Mack truck "three, four" times.

¶ 14    Jensen testified that on the morning of October 19, 2014, after Reiter left, Jensen and the Mack truck had to get out to the field, which was a little over three miles from Reiter Farm. Without Reiter at the farm to drive Jensen in the Mack truck and Jensen having no vehicle of his own, the only way for Jensen to get from the farm to the field was to take the Mack truck to report for work. When Jensen was on his way to the field in the Mack truck, he collided with a GMC Yukon (plaintiff's vehicle). Jensen admitted that he was at fault for the collision.

¶ 15    After the collision, Jensen was taken to the emergency room. Upon leaving the emergency room, police arrested Jensen, and he was required to post bail of approximately

5

$1500. Reiter's mother paid Jensen's bail. Jensen was not sure whether Reiter's mother was "a part of" the Reiter Farm.

¶ 16    As for his past employment, after retiring from doing fabrication, welding, maintenance, and mechanical work, Jensen started working for Reiter Farm "off and on." Jensen had not had a driver's license for about 20 years, and he had not had a personal car since he lost his driver's license. On the mornings that Jensen worked, Reiter picked up Jensen and then dropped Jensen off, either at Reiter Farm or in the field.

¶ 17    Jensen was at Reiter Farm on the day of the accident because "of the harvest." He only worked when he was needed, and he was paid for working. Jensen was never told to drive one of Reiter Farm's vehicles on a public roadway because there "never had [been] the occasion" to do so. Prior to the day of the collision, Jensen had never driven a Reiter Farm vehicle on a public roadway. On the day of the accident, no one from Reiter Farm told Jensen to drive the Mack truck on a public roadway to get to the field.

¶ 18    Although Jensen referred in his testimony to the place where the trucks were kept and where the barns were located as being "Reiter Farm," there was no signage indicating that property was, in fact, Reiter Farm. Peters lived on the property, and it was typically referred to as either "Dave's place or the shop." Jensen indicated that he was not testifying that the property was owned by and run by Reiter Farm. Jensen did not have a written contract to work for Reiter and Peters. No one had ever indicated that Jensen was a seasonal employee of Reiter Farm. Jensen worked for Reiter and Peters, and they paid Jensen, gave him directions, and worked with him. Jensen was originally hired as a mechanic to help work on farming equipment. Over time, Jensen's duties expanded, and he became a part-time fieldworker as well.

6

¶ 19        In the field and off the roads, Jensen ran a tractor and an auger cart. No one, including Reiter and Peters, ever gave Jensen permission to operate any of the trucks on the highways. On the day of the accident, no one had given Jensen permission to drive the Mack truck, and no one had directed him to take the Mack truck to the field. Jensen would have gotten paid whether he was waiting for Reiter to come back or whether he went to the field because Jensen would have been paid from the time he left his apartment. Jensen knew that without a driver's license, he had no right to drive a vehicle on the highways of the State of Illinois.

¶ 20        On the morning of October 19, 2014, Reiter had dropped Jensen off, instructed Jensen to gather items that would be needed in the fields, and told Jensen that he would be back. Jensen testified that his decision to take the truck was just a "whim" that should never have happened. Jensen had arrived at the farm that morning to work. The Mack truck was a work truck. Jensen testified that the reason he took the Mack truck to the field was to do work for Reiter Farm and for Peters. Jensen was asked whether it was true that on October 19, 2014, he worked for Reiter Farm, and he responded, "[r]ight."

¶ 21                              ii. Testimony of Ronald Reiter

¶ 22        Reiter testified that around October 2014, he was made the president of Reiter Farm, and he was currently still the president of Reiter Farm. In October 2014, Reiter's mother and two sisters were shareholders of Reiter Farm.

¶ 23        Reiter further testified that in October 2014, he and Peters had a crop sharing agreement, but their agreement was not reduced to writing. Under their agreement, Reiter and Peters had an understanding that there would be some division of crops and profits that resulted from the area they farmed. At some point in the history of them farming in the area, Reiter and Peters hired

7

Jensen (originally as a mechanic). Eventually, Reiter learned that Jensen could drive bigger tractors, so Jensen began help drive tractors as well.

¶ 24 Upon being questioned during his testimony, Reiter agreed that Jensen worked for Reiter Farm seasonally, during the planting season and the harvest season, but explained, "[i]t's a little tricky when you say Reiter Farm versus Ron [Reiter] and Dave [Peters] because Reiter Farm is separate in its own self as opposed to how we farm." According to Reiter, the crop sharing agreement was between him and Peters, individually, and they crop shared with Reiter Farm on one tract of ground, and "and the rest [they] cash rent[ed] from Reiter Farm, Inc., which [was] an entity that [they paid] to rent the ground from." Reiter Farm did not retain a benefit from the work they were doing and the crops they were harvesting on the field they were working in October 2014.

¶ 25 On October 19, 2014, Reiter Farm had a profit-sharing agreement with Peters to share in the profits in crops that were harvested, but not all the ground that Reiter and Peters farmed was that of Reiter Farm. Reiter testified that he and Peters "individually farm together; and [they] rent[ed] ground from Reiter Farm," but a majority of what they farmed was other people's properties. They rented from not only Reiter Farm, but they also rented from other people.

¶ 26 According to Reiter, on October 19, 2014, Jensen was working for "Ron [Reiter] and Dave [Peters]." None of the work that Jensen was doing on October 19, 2014, was for the benefit of Reiter Farm. Reiter testified that Reiter Farm did not retain any benefit from the crops that Reiter and Peters were harvesting on October 19, 2014. On October 19, 2014, Jensen was working for Reiter and Peters, and they were his bosses. Jensen's job was to help in any way that was asked of him. Both Reiter and Peters paid Jensen to do work.

¶ 27    Reiter testified that on October 19, 2014, Reiter picked up Jensen in the morning and brought him to "the farm." Jensen's workday began when Reiter picked him up. Peters was not there because he was already in the field. The Mack truck belonged to Peters and was used regularly during harvesting to take grain from the field to the grain elevator. Peters and his family lived at the "farm" location, which was where Reiter and Peters kept farm equipment for their farming operation, including Peters's Mack truck. It was also where the "shop" where Jensen did mechanic work and an office were located.

¶ 28    As of the morning of October 19, 2014, Reiter did not know that Jensen did not have a driver's license. Reiter knew that Jensen did not have a car, which was why Reiter had always arranged to pick Jensen up for work. After arriving at the farm on October 19, 2014, Reiter started the Mack truck but, soon after, remembered that he had to go to the store. Reiter left Jensen at the farm and left the Mack truck running because it was a diesel truck that had to be warmed up. The original plan had been that Reiter would drive the Mack truck, with Jensen riding in it, to meet Peters in the field. In the field, usually Reiter drove the Mack truck from the field to the grain elevator, Peters drove the combine, and Jensen drove the auger bin.

¶ 29    On the morning of October 19, 2014, Peters was at the field where he, Reiter, and Jensen would be working that day, but the Mack truck was at the farm and needed to get to the field. Jensen also needed to get to the field to report for work. Without Reiter at the farm to drive him, Jensen did not have any other way to get to the field but by taking the Mack truck. Sometime after Reiter left the farm on the morning of October 19, 2014, and prior to returning to the farm, Reiter learned that Jensen had driven the Mack truck and had been in motor vehicle crash.

¶ 30        Prior to October 19, 2014, Reiter had seen Jensen drive the Mack truck on the farm and in the field, but he had never seen Jessen drive the Mack truck on the roads. Jensen was permitted to drive the Mack truck, so long as it was not on the roads.

¶ 31        On the morning of October 19, 2014, before Reiter left the farm, he had instructed Jensen to gather anything he could think of to accomplish what needed to be done for the day in the field. Reiter never told Jensen to take the Mack truck and drive it to the field. The combine that was being operated by Peters in the field did not need an auger cart in operation every moment. The combine could hold about 320 bushels and work for 20 to 30 minutes without "discharging," so that it was not necessary that an auger cart be operating every moment that the combine was in operation. Reiter had never given Jensen the authority to operate any vehicle, including the Mack truck at issue, on the highways or roads of the State of Illinois. Operating motor vehicles on the highways was never part of Jensen's job. On October 19, 2014, Reiter did not expect Jensen to take the Mack truck and drive it to the field. Reiter intended for Jensen to wait for him to return from his 20-to-25-minute trip to the store. Reiter had not given Jensen permission to drive the truck. He also did not instruct Jensen to refrain from taking the truck to the field.

¶ 32                            iii. Testimony of Dave Peters

        Peters testified that although he participated in a crop share with Reiter Farm, he was a separate "entity" from Reiter Farm. He operated under his own name and was not incorporated. Peters owned the Mack truck at issue. According to Peters, Reiter Farm was not located at the property where his residence was located, although the mailing address of Reiter Farm was the same location as his personal residential address. The office located on that property was Peters's personal office, and not that of Reiter Farm. Peters's Mack truck (the truck driven by Jensen) was used by both Reiter Farm and by Peters in their farming operations to haul grain from the

10

field to the grain elevator. Peters typically left the trucking operations to Reiter, and Reiter maintained the keys for the Mack truck.

¶ 33        Peters testified that in October 2014, Jensen was working for him as a seasonal farmer. Because of the crop share arrangement between Reiter and Peters, Jensen's work would benefit both Reiter and Peters. Sometimes Jensen's work benefited Reiter Farm, if they were working the tract of land owned by Reiter Farm. When Jensen worked for Peters, he was paid by Peters in cash.

¶ 34        On the morning of October 19, 2014, Peters went out to the field and started harvesting with the combine. Peters expected Jensen to arrive in the field at some point. He did not know that Jensen did not have a valid driver's license. Jensen was not allowed to operate Peters's Mack truck in any way—not on the farm nor in the field. Peters was not aware that Jensen had previously operated the Mack truck. Peters could not think of any reason why Reiter or Jensen would say that Jensen was allowed to drive the Mack truck on the farm or in the field. Reiter never previously saw Jensen operate the Mack truck. Peters would not have seen Jensen operate the Mack truck because Peters operated the combine.

¶ 35        Reiter Farm owned a 40-acre tract of land that Reiter and Peters had a crop share agreement on. The land that Peters was harvesting on October 19, 2014, was not owned by Reiter Farm. Reiter Farm did not benefit in any way from the work that was being done on October 19, 2014. The land that Peters was working on October 19, 2014, in part, benefitted him.

¶ 36        On October 19, 2014, Peters was not an owner, officer, or an employee of Reiter Farm. Peters had never given Jensen permission to operate a truck or other licensed motor vehicle on the highways of the State of Illinois. Operating a truck or automobile on the highways of the State of Illinois was not part of Jensen's employment. Peters did not have any personal

11

knowledge of how Jensen had come to be operating his Mack truck on the day of the occurrence. There was nothing that Peters was doing in the field at the time of the accident that required the presence of the Mack truck.

¶ 37                                iv. Motions for Directed Verdict

¶ 38        At the close of the evidence, Peters and Reiter Farm made an oral motion for a directed verdict on the issue of agency. Plaintiff also argued for a directed verdict in his favor on the issue of agency and presented a written motion to the court (which he subsequently filed). Plaintiff contended that agency had been "unequivocally established." Plaintiff requested that the trial court, therefore, remove the issue of agency from the jury's consideration.

¶ 39        Additionally, plaintiff, upon being granted leave, filed a written response to Reiter Farm's oral motion for directed verdict. Plaintiff argued, among other things, that evidence showed that Jensen was an employee of Reiter Farm because Jensen had testified that he was working for Reiter Farm on the day of the collision, the Mack truck driven by Jensen in the collision was used by Reiter Farm in its farming operations, the Mack truck was stored at the location of the mailing address for Reiter Farm, and Reiter, the president of Reiter Farm, had testified that Jensen was a seasonal employee of Reiter Farm. Plaintiff acknowledged that Reiter clarified his testimony regarding Reiter Farm in that Reiter Farm was a separate entity from Reiter and Peters as individuals and that Reiter had testified that Reiter and Peters, individually, had a crop share agreement with one another. Plaintiff also argued there was circumstantial evidence that a jury could consider in determining whether Jensen was an agent of Reiter Farm. Plaintiff further noted that Jensen had testified that Reiter's mother, who was a shareholder of Reiter Farm, paid Jensen's bail after the collision, which plaintiff contended were facts that should be submitted to the jury to consider in relation to the alleged agency relationship between

12

Jensen and Reiter Farm. Plaintiff additionally argued that Peters's oral motion for directed verdict on the issue of agency was "entirely disposed of" by plaintiff's arguments set forth in his written motion for directed verdict.

¶ 40    In denying the motions for directed verdict, the trial court found that Jensen's testimony was sufficient evidence of an agency relationship between Jensen and Reiter Farm to withstand defendants' motion for directed verdict where Jensen testified that he was working for Reiter Farm on the day of the incident. The trial court also found that in regard to the issue of agency between Jensen and Peters, an inference could have been drawn from the evidence to present a question of fact for the jury.

¶ 41    After deliberating, the jury returned a verdict finding in favor of plaintiff and against all defendants in the amount of $142,390.12. The trial court subsequently entered a judgment for plaintiff and against all defendants in that amount.

¶ 42                            v. Posttrial Motions

¶ 43    On November 16, 2018, defendants Peters and Reiter Farm filed a posttrial motion for judgment notwithstanding the verdict (judgment *n.o.v.*) or, in the alternative, a motion for new trial. In their motion, Peters and Reiter Farm argued that the trial court erred in denying their motion for directed verdict, requested that the trial court reconsider its denial of that motion, and requested the trial court grant their motion for judgment *n.o.v.* Peters and Reiter Farm argued that no evidence was presented indicating that Jensen was in the course and scope of his employment at the time of the collision. Reiter Farm additionally argued that judgment *n.o.v.* should be granted as to it because the evidence showed that Reiter Farm was one of Reiter and Peters's landlords and the land they were harvesting on the day of the collision was not owned by Reiter Farm.

13

¶ 44 In their motion for new trial, Peters and Reiter Farm argued that the verdict was contrary to the manifest weight of the evidence. Peters and Reiter Farm argued that even if Jensen subjectively believed that driving to the field would assist in the farming operation, such a subjective belief was not sufficient to create an agency relationship because he was not within the course and scope of his employment where he did not have a driver's license or permission to drive on the public roads.

¶ 45 The trial court denied Peters and Reiter Farm's posttrial motion. Peters and Reiter Farm appealed.

¶ 46                                    II. ANALYSIS

¶ 47 On appeal, Peters and Reiter Farm argue that the trial court erred by denying their motions for directed verdict and for judgment *n.o.v.* because evidence at trial established that: (1) Jensen was not an agent or employee of Peters or Reiter Farm for the purpose of imposing vicarious liability; and (2) Jensen was not acting within the scope of his employment at the time of the incident. Alternatively, Peters and Reiter Farm contend on appeal that the trial court erred by denying their motion for new trial because the verdict was against the manifest weight of the evidence.

¶ 48 Directed verdicts and judgments *n.o.v.* should be entered only in cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on the evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We review an adverse ruling on either a motion for a directed verdict or a judgment *n.o.v.* under a *de novo* standard of review. *Harris v. Thompson*, 2012 IL 112525, ¶ 15. Although these motions are made at different times, "they

14

raise the same questions and are governed by the same rules of law." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37.

¶ 49    A directed verdict is appropriate when the plaintiff has failed to establish a *prima facie* case. *Sullivan v. Edward Hosp.*, 209 Ill. 2d 100, 123 (2004). Where a plaintiff fails to present at least some evidence on every essential element of the cause of action, the defendant is entitled to have a judgment entered in his or her favor as a matter of law. *Id*. Failing to produce a required element of proof to support the cause of action results in no cause having been presented for the jury to consider so that a directed verdict for the defendant is proper. *Id.*

¶ 50    A motion for judgment *n.o.v.* presents a question of law in which a court must determine whether, after considering all the evidence, together with all reasonable inferences from the evidence in an aspect most favorable to the plaintiff, there is a total failure to prove any necessary element of plaintiff's case. *Lawlor*, 2012 IL 112530, ¶37. The standard for entering a judgment *n.o.v.* is high, and the entry of a judgment *n.o.v.* is not appropriate if reasonable minds may differ as to inferences or conclusions to be drawn from the facts that have been presented. *Id*. If the trial court erred in denying a motion for a judgment *n.o.v.*, a court of review will reverse the verdict without remand. *Id.*

¶ 51    Generally, a person injured by another's negligence must seek his or her remedy from the individual who caused the injury. *Adames v. Sheahan*, 233 Ill. 2d 276, 298 (2009). However, the relationship of employer and employee creates an exception to that general rule pursuant to the theory of *respondeat superior*, under which "an employer can be liable for the torts of his employee when those torts are committed within the scope of the employment." *Id*. Under *respondeat superior*, an employer's vicarious liability for the negligent acts of an employee

15

extends to negligent, willful, malicious, or criminal acts of the employee if those acts are committed within the scope of employment. *Id.*

¶ 52     "The test for determining whether an agency relationship exists is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Bowyer as Next Friend of Eskra v. Adono*, 2020 IL App (3d) 180685, ¶ 37. "The burden of proving the existence and scope of an agency relationship is on the party seeking to impose liability on the principal." *Lawlor*, 2012 IL 112530, ¶ 44.

¶ 53     Therefore, to prove Peters and Reiter Farm were vicariously liable for Jensen's acts or omission in this case, plaintiff was required to prove that an agency relationship existed between them. See *id.* Whether a person is an agent (or independent contractor) depends on the facts and circumstances of each case, with the hallmark indication of agency being the principal's right to control the manner in which the agent performs his or her work. *Id.* The following factors are also to be considered when determining whether the alleged agent is an agent or independent contractor: "(1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision of the work done." *Id.*

¶ 54     In this case, in addition to seeking damages from Jensen for injuries that plaintiff incurred as the result of Jensen's negligence, plaintiff also sued Peters and Reiter Farm for Jensen's negligence under a theory *respondeat superior*. A jury found against Jensen, as well as against both Peters and Reiter Farm. On appeal, Peters and Reiter Farm argue the trial court erred in denying their motions for directed verdict and for judgment *n.o.v.* because the evidence showed that Jensen was not their employee.

16

¶ 55                                    A. Reiter Farm

¶ 56          Here, although Jensen testified that he was working for Reiter Farm on the day of the

collision, there was no evidence presented that an agency relationship existed between Jensen

and Reiter Farm on the day of the collision. The evidence showed that on the day of the collision,

Jensen was working for Peters and Reiter as individuals and they, as individuals, controlled the

manner in which he performed his work. There was no indication that Reiter Farm controlled the

manner in which Jensen performed his work. Additionally, Jensen was paid in cash by Reiter and

Peters. There was no evidence that Jensen was paid by Reiter Farm. Arguably, Reiter, in his

capacity as president of Reiter Farm, could, among other things, direct, control, or authorize the

method in which Jensen performed work for Reiter Farm when Jensen was working for Reiter

Farm. However, there was no evidence presented that on the day of the collision Reiter was

acting in his capacity as the president of Reiter Farm in relation to Jensen's work. Rather, the

evidence showed that on the day of the incident, Jensen was working for Reiter and Peters in

their individual capacities, Reiter and Peters were working for themselves, and they were

harvesting land that was not owned by Reiter Farm and from which Reiter Farm would retain no

benefit.

¶ 57          Therefore, plaintiff failed present some evidence of an agency relationship between

Jensen and Reiter Farm in relation to work being done by Jensen, Peters, and Reiter on October

19, 2014. See *Sullivan*, 209 Ill. 2d at 123; (a directed verdict is appropriate when the plaintiff has

failed to establish a *prima facie* case). Even after considering all the evidence, together with all

reasonable inferences from the evidence in an aspect most favorable to the plaintiff, there was a

failure to prove that an employer-employee relationship existed between Jensen and Reiter Farm

on the day of the collision. See *Lawlor*, 2012 IL 112530, ¶37. Because all of the evidence,

together with all reasonable inferences, viewed in its aspect most favorable to plaintiff, so overwhelmingly favored Reiter Farm that no contrary verdict based on the evidence could stand, the trial court erred in denying Reiter Farm's motions for directed verdict and judgment *n.o.v.* See *Pedrick*, 37 Ill. 2d 494, 510 (1967); *Parks v. Brinkman*, 2014 IL App (2d) 130633, ¶ 73 (directed verdict or judgment *n.o.v.* may be granted where the plaintiff fails to present some evidence on every necessary element of the cause of action). Consequently, we reverse the judgment entered against Reiter Farm. Given this conclusion, we need not address the issue of whether the trial court erred by denying Reiter Farm's posttrial motion for new trial.

¶ 58                                B. Dave Peters

¶ 59        As to whether Jensen was an employee of Peters, the evidence showed that Jensen was hired by Peters and Reiter to help when needed and was paid by them in cash. Reiter and Peters gave Jensen directions. Jensen was originally hired by Reiter and Peters in 2010 as a mechanic. Jensen's duties were expanded to include Jensen working for Reiter and Peters as a fieldworker. Both Reiter and Peters were Jensen's "bosses." Jensen's job was to help in any way that was asked of him. Thus, there was at least some evidence presented to the jury that an agency relationship existed between Jensen and Peters. Additionally, considering the evidence presented, together with all reasonable inferences in an aspect most favorable to plaintiff, we cannot say that there was a total failure by the plaintiff to prove that Jensen was an employee of Peters.

¶ 60        Peters argues that that even if Jensen was his employee, the evidence at trial established that Jensen was not acting within the scope of his employment at the time of the collision. "The party seeking to impose liability on the principal has the burden of proving the existence and scope of the alleged agency relationship." *Bowyer*, 2020 IL App (3d) 180685, ¶ 39. Our supreme

18

court has adopted three general criteria, as set forth in the Second Restatement of Agency (Restatement), to determine whether an employee's acts are within the scope of employment: (1) the conduct is "of the kind he is employed to perform"; (2) the conduct "occurs substantially within the authorized time and space limits"; and (3) the conduct "is actuated, at least in part, by a purpose to serve the master *** [.]" *Adames*, 233 Ill. 2d at 298 (quoting Restatement (Second) of Agency § 228 (1958)); see also *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 164 (2007). An employee's conduct is not within the scope of employment "if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.* at 299 (quoting Restatement (Second) of Agency § 228 (1958)). All three of the criteria of section 228 of the Restatement must be met to conclude that an employee was acting within the scope of his or her employment. *Id.*; *Bagent*, 224 Ill. 2d at 165.

¶ 61       As for the first criterion—whether the conduct is of the kind the employee is employed to perform—a court is required to determine "whether the complained-of act of the employee, although not authorized by the employer, [was] nevertheless so similar or incidental to employer-authorized conduct as to be within the scope of employment." *Bagent*, 224 Ill. 2d at 166. At trial in this case, the evidence showed that Jensen was originally employed as a mechanic to fix farming equipment and his duties expanded to include seasonal field work and included helping with the harvest in the fall. While harvesting, the Mack truck was used to transport grain and, on a few occasions, Jensen drove the Mack truck in the field or on the farm. Although Jensen was not necessarily employed to operate any vehicles on the roads, there was at least some evidence presented for the jury to determine that Jensen driving the Mack truck three miles (from Peters's home/Jensen Farm to the nearby field) in order to assist with harvesting the grain, after gathering items that were needed in field, was similar or incidental to his employer-authorized duties. See

19

*id*. Also, in considering the evidence presented and all reasonable inferences in an aspect most favorable to plaintiff, we cannot say there was a total failure by the plaintiff to prove that Jensen driving the Mack truck out to the field on the day of the collision was similar or incidental to authorized conduct.

¶ 62    As for the remaining two criteria—whether Jensen's conduct occurred substantially within the authorized time and space limits and whether Jensen's conduct actuated by a purpose to serve the employer—the evidence was sufficient for a jury to conclude those criteria were met. The evidence showed that Jensen was working for Reiter and Peters from the moment he was picked up by Reiter in the morning and, at the time of the collision, Jensen was transporting himself, the Mack truck, and items needed in the field, to the field in order to assist with harvesting.

¶ 63    Therefore, as to whether Jensen was acting within the scope of his employment at the time of the collision and, ultimately, whether Peters was vicariously liable, we cannot say that the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favored Peters, that no contrary verdict based on the evidence could ever stand. See *Pedrick*, 37 Ill. 2d 494, 510 (1967). Consequently, the trial court did not err in denying Peters's motion for directed verdict and judgment *n.o.v.*

¶ 64    We now turn to the trial court's denial of Peters's posttrial motion for a new trial. On a motion for new trial, the trial court, after considering the evidence, will set aside the jury's verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Steed v. Rezin Orthopedics and Sports Medicine*, 2021 IL 125150, ¶ 44. A verdict will be deemed to be contrary to the manifest weight of the evidence if the opposite conclusion is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based upon any of the

evidence. *Id.* "We will not reverse a court's ruling on a motion for new trial unless it is affirmatively shown that the trial court clearly abused its discretion." *Id.* (quoting *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 101 (2010)). In this case, given the evidence presented at trial, as discussed above, we cannot say that the jury's finding that Jensen was acting within the scope of his employment with Peters's was unreasonable, arbitrary, or not based upon any of evidence, nor can we say that the opposite conclusion is clearly evident. See *id.* Consequently, the trial court did not its abuse its discretion in denying Peters's motion for new trial.

¶ 65                                     III. CONCLUSION

¶ 66         For the foregoing reasons, we affirm the judgment of circuit court of Kankakee County in part as to defendant Peters and reverse in part as to defendant Reiter Farm.

¶ 67         Affirmed in part and reversed in part.